**MAR GONG v. McGRANERY, U. S.
Atty. Gen.
No. 13803.**

United States District Court
S. D. California, Central Division.

Dec. 15, 1952.

J. Edward Keating, Los Angeles, Cal., for plaintiff.

Walter S. Binns, U. S. Atty., Clyde C. Downing, Robert K. Grean, Asst. U. S. Atty., Los Angeles, Cal., for defendant.

WESTOVER, District Judge.

This is an action filed under Section 503 of the United States Nationality Act, Title 8. U.S.C.A. § 903, by which plaintiff seeks judgment and decree of this court, declaring that he is a national of the United States of America.

The case at bar is only one of many filed by Chinese under Section 503, requesting the court to declare that they are nationals of the United States of America. Because of the great number of filings in this district on the same subject matter (and for the convenience of the court and litigants) all these cases were assigned to this department for hearing; and this court has now tried a sufficient number of them to establish the pattern they follow.

Evidence in the cases heretofore tried confirms approximately the following mutuality of facts:

The alleged father of these China-born applicants was born either in the United States of Chinese parentage or in China of an American-citizen Chinese father (admitted to this country under a certificate of identity reciting that he is in fact the son of an American-citizen Chinese father) and a native Chinese mother.

The alleged father (if a resident of the United States during young adulthood) returns to the ancestral village in China for the purpose of contracting marriage. On his arrival at the village a marriage is usually arranged, either through the efforts of his mother, if she still lives, or through efforts of a marriage broker. The marriage is celebrated according to Chinese custom, and the parties live together as husband and wife.

Within a year or so a child is born. The father usually remains in China until after his wife conceives the second time, and then he returns to the United States. When he re-enters the United States the first child is only a toddler, and the second is not yet born. In making a statement to the Immigration authorities on re-entry, the father gives the name of the older child and indicates that his wife is pregnant. He then resumes residence in the United States. His children allegedly grow up in China, and when they are in their mid-teens, or older, application is filed for admittance into the United States as sons of an American-Chinese father and a native Chinese mother.

In many cases the last-born child is not seen by the father until the son arrives in the United States when seeking admission. If the entry-seeking child was born while the father was in China, then father and son have not seen each other between the

time of the father's departure from China and the son's arrival in the United States—usually a period of many years.

In many instances the father makes more than one trip to China—sometimes three or four—but in each instance of return visits the trip produced another "crop" of sons. If and when the father returns to China on second and subsequent trips, the children born as the result of his prior trips home are presented to him by his wife as his off-spring.

Invariably in these nationality cases it is asserted that letters have passed between the parents and, sometimes, between the father and the children; but very few of these letters have been introduced in evidence and, when introduced, refer only to the years immediately preceding the sons' filing of application to be admitted into the United States.

These alleged fathers also contend they send money for the families' support; but in only rare instances is there any proof of this, except the word of the alleged father or that of some immediate, close friend.

From evidence introduced in these cases, certain facts seem common to all of them. Although each case involves a different set of individuals and (it would be supposed) individual sets of facts, there is, however, a marked similarity of facts among them:

1. There is apparently no impotence. In all of the cases so far tried by this court, there has been no evidence of a visit to China on the part of the male American-Chinese which failed to produce an off-spring. These visits result in not less than one pregnancy, usually two, and sometimes more. It would appear that all Chinese-American males are very successful in marrying fertile wives and in producing children.

2. The children resulting from these marriages are preponderately male. In all cases heard by this court to date, not one has sought the entry of a female, and only one or two have mentioned daughters. This male-female ratio is especially startling when compared with the United States average which is approximately fifty-fifty. If a marriage does produce a daughter among the many sons, her entry into the United States is rarely sought. One of the cases before this court reported three generations of male offspring and reported not one female child.

3. These Chinese children usually come from rural villages where the natives live in small dwellings, customarily made of brick. The term "brick" to designate building material does not have the same connotation in China as does that term in the United States, for the Chinese "brick" is more like mud or adobe. The houses have tile (unbaked mud) floors. There are no floor coverings. The dwellings have very little ventilation. There are usually two doors, classified as "greater and lesser gates." There are few windows, if any, and there is no such thing as cross-ventilation. In some houses, however, there are sky-lights. Modern plumbing is unknown. In fact, there is no running water in the houses; the water for domestic use is obtained from a common well in the village.

Public health and health facilities are unknown in the villages from which these children emanate. There are no hospitals and no doctors, and when births occur only the assistance of a mid-wife or of a relative is available. In spite of this, no infection takes its toll, as mothers and infants invariably survive the birth process. Apparently no deformed and no ailing children are produced by these marriages, for those coming before this court always seem to be well, strong, healthy males.

4. Children's diseases are apparently unknown in rural villages such as those described above, as none of the sons before this court ever admits having experienced an illness. In a country beset with plagues, droughts and floods, dearth of illness is truly remarkable among these admission-seeking sons. All conceptions produce healthy, robust, surviving males. Still-birth and death during infancy just never occur in these families. Apparently these people live a charmed life. Accidents never disfigure nor take the lives of their children. For each birth or pregnancy the father has reported to immigration authorities upon returning from a visit to China a strong, healthy, robust individual results

—usually male—who later presents himself for admission into the United States.

Because of the background outlined in paragraphs 1 through 4 above, immigration authorities and the State Department have become suspicious of these applicants. When applicants go to the United States Consul's office for certificates of identity for entry into the United States, hearings are conducted. At these hearings it is required that each applicant establish the fact that he is the child of an American. If the applicant can do so, he is given a certificate of identity. If doubt exists, the certificate of identity is denied. Because of the inability of the State Department to disprove statements made by applicants and their immediate relatives, many certificates of identity are granted. On the other hand, when it appears that serious discrepancies exist, certificates are refused.

At the trials before this court, the government has intimated on several occasions that the child seeking recognition as a national is not in fact the child of the alleged American-Chinese father. The government insinuates there has been substitution of children and that the individual before the court is not in truth and in fact the natural son of the alleged father but is, perhaps, a relative substituted for a son (who probably did not survive infancy) solely for the purpose of entry into the United States.

These are exceedingly unsatisfactory cases to try. Ordinarily the District Attorney has no way to make advance preparation for trial. He does not know which witnesses will be called nor the testimony they will give. The only testimony which may be produced by the District Attorney is negative, as positive testimony to disprove the claim of the alleged child is unobtainable. As a consequence, it is necessary for the District Attorney to depend upon discrepancies developed during trial.

A discrepancy in any case is a poor crutch on which to lean, and in these cases discrepancies are unreliable. Because of the difference in customs between the two races involved, the looseness with which terms are employed by Chinese and the difficulty of interpretation, innocent discrepancies may creep into the record. In some cases two Chinese interpreters were present in court, and they themselves could not agree as to what the witness said.

Discrepancies which in the ordinary law suit would mean something are in these cases of little import. For instance, age is one of the things which should be definite. Each person is supposed to know his own age and when in this country a person gives a statement as to his age, it is taken as an established fact; but we have discovered that among Chinese ages are not computed in the same manner as they are in America. Chinese infants are one year old at birth and may become two years of age, if born in a particular phase of the moon, when actually (according to the occidental calendar) they may be only a few months old. When a Chinese witness is asked for a date of birth, he usually gives it in terms of the calendar of the Chinese Republic. This must be interpreted in terms of the occidental calendar, which makes for additional confusion, as it appears that in the Chinese calendar some years have a duplication of certain months. To complicate the matter further, some Chinese who have resided in this country for a while, when testifying as to birth dates give the year according to the western calendar and the month and day according to the Chinese Republic calendar.

Names are also important in the ordinary law suit. In these cases, however, names do not have as much significance, since it appears that some Chinese babies are given a "milk" name (as well as the family surname), later a school name is given, and they acquire a "marriage" name. As these appellations are sometimes used indiscriminately, one person may be known by several names. We have had one instance in which a plaintiff was known by five different names. In China the surname is always written first. However, some Chinese who have resided in this country for a time follow our custom of writing the surname last. Also, it appears that even when the parties can agree upon a name as designating a particular individual, there are several ways in which that name may be spelled, and on one oc-

casion in this court the proper name of the family was spelled by the interpreter three different ways.

Plaintiffs invariably come from the villages of China. Any grouping of houses is designated a village. The villages do not have streets as we understand that term, but the houses are built in rows. One house may constitute a row, and sometimes in computing the number of houses in the village, the witness computes the lots and designates as "houses" in a certain row the number of lots in that row, irrespective of the fact that a house may not be built on each lot. It also appears that the villages have a "head" and a "tail." The villages are not as a general rule found along main highways but are isolated communities, and there seems to be no particular reason why a certain part of the village is designated "head" and another part "tail", except that it has always been Chinese custom to designate them thus.

Chinese witnesses are often very literal in their testimony. Their interpretation of questions is not the interpretation as made by the occidental mind. For instance, one plaintiff was asked: "When did you first see your wife?" He replied that he first saw his wife in the living-room of his home on the day of their marriage. It appeared from other testimony that when the bride arrived at the home of the bridegroom for the wedding ceremony, she came in a sedanchair, accompanied by attendants, and that plaintiff had gone outside to the chair to greet her. When he was called upon to explain this apparent discrepancy, plaintiff readily admitted he had gone out to the chair and had greeted his bride, but he said he did not really see her until in the living-room of his home where she raised her veil, and he saw her face for the first time. According to his interpretation, he did not actually "see" his bride until he looked upon her face.

In one of these cases a witness testified that he lived at a certain address, such as East 45 Street. When it was ascertained on cross-examination that he did not live at East 45 Street but at some other location, it developed that the term "east" was used by him to designate the side of the street on which his residence was situated and that he did actually reside on the east rather than the west side of the street.

In speaking of money, these Chinese mention silver money, when in fact they are speaking of silver-backed currency. Instead of handling so many silver dollars as their testimony would indicate, they had handled so many dollars in currency which was silver-guaranteed by the government.

In another case a discrepancy arose relative to the burial place of plaintiff's grandmother. Plaintiff gave the place as of one designation, while other witnesses mentioned an entirely different place. Inasmuch as plaintiff had attended the funeral, this appeared to be a serious discrepancy, until he was called upon to explain it, and he said: "Why, they were talking about the place she was buried the second time and not the first burial place."

All the foregoing indicates that in order to disentangle the web woven by the Chinese family, it takes not only a "Philadelphia lawyer" but also a judge who will patiently listen to the testimony of the various witnesses and attempt to evaluate the discrepancies which develop. In fact, if no discrepancies developed, the court would be rather suspicious, for the court is constantly reminding its juries that "innocent misrecollection, like failure of recollection, is not an uncommon experience."

American citizenship is a precious possession in the eyes of the people of the world. It is not a thing to be lightly taken from those who hold it; nor is it to be lightly bestowed. The burden is upon plaintiff to establish his right to be declared a national; and often when discrepancies develop it is necessary for the court not only to evaluate the testimony given but also to observe and weigh the conduct and demeanor of the various witnesses as they testify. Little things, unimportant individually, may add up to such an extent that the court may feel plaintiff has not sustained the burden of proof incumbent upon him. On the other hand, glaring discrepancies may not cause the court to deny

citizenship, as discrepancies may be explained away or may not refer to a material fact.

In the case at bar there is no need for the court to discuss the testimony of the various witnesses nor point out the discrepancies therein. It is sufficient to say that the court is of the opinion (taking the testimony as a whole and considering the demeanor of the witnesses on the stand) that plaintiff has not sustained the burden of proof and is not entitled to judgment.

Findings of fact and conclusions of law are to be prepared by counsel for defendant by December 30, 1952.