# RUSK, SECRETARY OF STATE, *v.* CORT.

No. 20.   Argued October 11, 1961.—Decided April 2, 1962.

*Oscar H. Davis* argued the cause for appellant. With him on the briefs were *Solicitor General Cox, Assistant Attorney General Miller, Beatrice Rosenberg* and *Jerome M. Feit.*

*Leonard B. Boudin* argued the cause for appellee. With him on the brief was *Victor Rabinowitz.*

Briefs of *amici curiae,* urging affirmance, were filed by *Jack Wasserman, David Carliner, Rowland Watts* and *Lawrence Speiser* for the American Civil Liberties Union, and by *Milton V. Freeman, Robert E. Herzstein, Horst Kurnik* and *Charles A. Reich* for Angelika Schneider.

MR. JUSTICE STEWART delivered the opinion of the Court.

Section 349 (a) (10) of the Immigration and Nationality Act of 1952 provides:

> "From and after the effective date of this Act a person who is a national of the United States whether by birth or naturalization, shall lose his nationality by—

> .        .        .        .        .

> "(10) departing from or remaining outside of the jurisdiction of the United States in time of war or during a period declared by the President to be a period of national emergency for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States. For the purposes of this paragraph failure to comply with any provision of any compulsory service laws of the United States shall raise the presumption that the departure from or absence from the United States was for the purpose of evading or avoiding training and service in the military, air, or naval forces of the United States." [1]

---

[1] 66 Stat. 163, 267–268, 8 U. S. C. § 1481 (a) (10).

The appellee, Joseph Cort, is a physician and research physiologist. He was born in Massachusetts in 1927. In May of 1951 he registered with his Selective Service Board under the so-called "Doctors' Draft Act." [2] A few days later he left the United States for Cambridge, England. In 1953, while still in England, he was repeatedly notified by his draft board to report for a physical examination either in the United States or at an examining facility in Europe. He disregarded these communications, and in September of 1953 his draft board ordered him to report to Brookline, Massachusetts, for induction into the Armed Forces. He failed to report as directed and remained in England. In 1954 an indictment charging him with draft evasion was returned in the United States District Court for the District of Massachusetts. Earlier that year, after the British Home Office had refused to renew his residence permit, Cort had gone to Prague, Czechoslovakia. He has been there ever since.

In 1959 Cort applied to our Embassy in Prague for a United States passport, his original passport having long since expired. His application was denied by the Passport Office of the Department of State on the ground that he had lost his citizenship under § 349 (a)(10) of the 1952 Act by remaining outside the United States for the purpose of avoiding military service. Subsequently, the State Department's Board of Review on Loss of Nationality affirmed the decision of the Passport Office, on the same ground.

Cort then instituted the present action against the Secretary of State in the United States District Court for the District of Columbia, seeking declaratory and injunctive relief. His complaint alleged that he had not remained abroad to evade his military obligations, and

---

[2] 50 U. S. C. App. § 454 *et seq.* Appellee had previously registered as a regular registrant under the Universal Military Training and Service Act of 1948.

that § 349 (a)(10) was in any event unconstitutional. A three-judge court was convened. The Secretary of State moved to dismiss the action upon the ground that § 360 (b) and (c) of the Immigration and Nationality Act of 1952 provide the exclusive procedure under which Cort could attack the administrative determination that he was not a citizen. The District Court rejected this contention, holding that it had jurisdiction of the action for a declaratory judgment and an injunction. On motions for summary judgment, the court determined that the appellee had remained abroad to avoid service in the Armed Forces. Relying upon *Trop* v. *Dulles*,[3] the court held, however, that § 349 (a)(10) was unconstitutional, and that consequently the appellee's citizenship had not been divested. The court accordingly entered a judgment declaring the appellee to be a citizen of the United States and enjoining the Secretary of State from denying him a passport on the ground that he is not a citizen. *Cort* v. *Herter*, 187 F. Supp. 683. This is a direct appeal from that judgment.

The only question we decide today is whether the District Court was correct in holding that it had jurisdiction to entertain this action for declaratory and injunctive relief. If not, we must vacate the judgment and direct the District Court to dismiss the complaint.[4]

---

[3] 356 U. S. 86.

[4] We postponed consideration of the question of our jurisdiction of this appeal until the hearing of the case on the merits. 365 U. S. 808. Under 28 U. S. C. § 1252, a direct appeal may be taken from a District Court decision holding unconstitutional an Act of Congress in a civil action in which an officer of the United States is a party. Since the District Court held § 349 (a)(10) unconstitutional, this appeal is properly before us under § 1252.

An alternative basis for our jurisdiction over this appeal might be found in 28 U. S. C. § 1253, providing for direct appeals from the decisions of three-judge courts convened under 28 U. S. C. §§ 2282,

In support of its jurisdiction the District Court relied upon the Declaratory Judgment Act and the Administrative Procedure Act. 187 F. Supp., at 685. The Declaratory Judgment Act, 48 Stat. 955, as amended, 28 U. S. C. § 2201, provides:

> "In a case of actual controversy within its jurisdiction, except with respect to Federal taxes, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought. Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."

Section 10 of the Administrative Procedure Act provides:

> "Except so far as (1) statutes preclude judicial review or (2) agency action is by law committed to agency discretion—
>
> "(a) RIGHT OF REVIEW.—Any person suffering legal wrong because of any agency action, or adversely affected or aggrieved by such action within the meaning of any relevant statute, shall be entitled to judicial review thereof.
>
> "(b) FORM AND VENUE OF ACTION.—The form of proceeding for judicial review shall be any special statutory review proceeding relevant to the subject matter in any court specified by statute or, in the

---

2284. But since jurisdiction is clearly authorized by 28 U. S. C. § 1252, we need not inquire further into the applicability of 28 U. S. C. § 2282 to this case. In view of the unanimous decision below, the fact that three judges heard the case originally would not affect an otherwise final and reviewable decision of the District Court. See *Thompson* v. *Whittier*, 365 U. S. 465; compare *Garment Workers* v. *Donnelly Co.*, 304 U. S. 243, 251–252.

absence or inadequacy thereof, any applicable form of legal action (including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus) in any court of competent jurisdiction. Agency action shall be subject to judicial review in civil or criminal proceedings for judicial enforcement except to the extent that prior, adequate, and exclusive opportunity for such review is provided by law." 60 Stat. 243, 5 U. S. C. § 1009.

Section 12 of the Administrative Procedure Act provides in part:

"No subsequent legislation shall be held to supersede or modify the provisions of this Act except to the extent that such legislation shall do so expressly." 60 Stat. 244, 5 U. S. C. § 1011.

On their face the provisions of these statutes appear clearly to permit an action such as was brought here to review the final administrative determination of the Secretary of State. This view is confirmed by our decisions establishing that an action for a declaratory judgment is available as a remedy to secure a determination of citizenship—decisions rendered both before and after the enactment of the Administrative Procedure Act. *Perkins* v. *Elg,* 307 U. S. 325; *McGrath* v. *Kristensen,* 340 U. S. 162. Moreover, the fact that the plaintiff is not within the United States has never been thought to bar an action for a declaratory judgment of this nature. *Stewart* v. *Dulles,* 101 U. S. App. D. C. 280, 248 F. 2d 602; *Bauer* v. *Acheson,* 106 F. Supp. 445; see *Flemming* v. *Nestor,* 363 U. S. 603.

It is the appellant's position, however, that despite these broad provisions of the Declaratory Judgment Act and the Administrative Procedure Act, Cort could not litigate his claim to citizenship in an action such as the

one he brought in the District Court, but is confined instead to the procedures set out in subsections (b) and (c) of § 360 of the Immigration and Nationality Act of 1952. Section 360 establishes procedures for determining claims to American citizenship by those within and without the country. Subsection (a) covers claimants "within the United States" and authorizes an action for a declaratory judgment against the head of the agency denying the claimant a right or privilege of citizenship— except that such an action cannot be instituted if the issue of citizenship arises in connection with an exclusion proceeding.[5] Subsections (b) and (c) deal with citizenship claimants "not within the United States." The former provides, with limitations, for the issuance abroad of certificates of identity "for the purpose of traveling to a port of entry in the United States and applying for admission." The latter subsection declares that a person issued such a certificate "may apply for admission to the United States at any port of entry, and shall be subject

---

[5] Section 360 (a), 66 Stat. 163, 273, 8 U. S. C. § 1503 (a):

"(a) If any person who is within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of title 28, United States Code, against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of, or in connection with any exclusion proceeding under the provisions of this or any other act, or (2) is in issue in any such exclusion proceeding. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in which such person resides or claims a residence, and jurisdiction over such officials in such cases is hereby conferred upon those courts."

to all the provisions of this Act relating to the conduct of proceedings involving aliens seeking admission to the United States." Judicial review of those proceedings is to be by habeas corpus and not otherwise.[6]

---

[6] Section 360 (b) and (c), 66 Stat. 163, 273–274, 8 U. S. C. § 1503 (b) and (c):

"(b) If any person who is not within the United States claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may make application to a diplomatic or consular officer of the United States in the foreign country in which he is residing for a certificate of identity for the purpose of traveling to a port of entry in the United States and applying for admission. Upon proof to the satisfaction of such diplomatic or consular officer that such application is made in good faith and has a substantial basis, he shall issue to such person a certificate of identity. From any denial of an application for such certificate the applicant shall be entitled to an appeal to the Secretary of State, who, if he approves the denial, shall state in writing his reasons for his decision. The Secretary of State shall prescribe rules and regulations for the issuance of certificates of identity as above provided. The provisions of this subsection shall be applicable only to a person who at some time prior to his application for the certificate of identity has been physically present in the United States, or to a person under sixteen years of age who was born abroad of a United States citizen parent.

"(c) A person who has been issued a certificate of identity under the provisions of subsection (b), and while in possession thereof, may apply for admission to the United States at any port of entry, and shall be subject to all the provisions of this Act relating to the conduct of proceedings involving aliens seeking admission to the United States. A final determination by the Attorney General that any such person is not entitled to admission to the United States shall be subject to review by any court of competent jurisdiction in habeas corpus proceedings and not otherwise. Any person described in this section who is finally excluded from admission to the United States shall be subject to all the provisions of this Act relating to aliens seeking admission to the United States."

Thus, the question posed is whether the procedures specified in § 360 (b) and (c) provide the only method of reviewing the Secretary of State's determination that Cort has forfeited his citizenship. More precisely stated, the question in this case is whether, despite the liberal provisions of the Administrative Procedure Act, Congress intended that a native of this country living abroad must travel thousands of miles, be arrested, and go to jail in order to attack an administrative finding that he is not a citizen of the United States. We find nothing in the statutory language, in the legislative history, or in our prior decisions which leads us to believe that Congress had any such purpose.

The Administrative Procedure Act confers the right to judicial review of "any agency action." The procedures of § 360 (b) and (c) would culminate in litigation not against the Secretary of State whose determination is here being attacked, but against the Attorney General. Whether such litigation could properly be considered review of the Secretary of State's determination presents a not insubstantial question. Putting to one side this conceptual difficulty, it is to be noted that subsections (b) and (c) by their very terms simply provide that a person outside of the United States who wishes to assert his citizenship *"may"* apply for a certificate of identity and that a holder of a certificate of identity *"may"* apply for admission to the United States. As the District Court said, "The language of the section shows no intention to provide an exclusive remedy, or any remedy, for persons outside the United States who have not adopted the procedures outlined in subsections (b) and (c). Neither does the section indicate that such persons are to be denied existing remedies." 187 F. Supp., at 685.

The predecessor of § 360 of the 1952 Act was § 503 of the Nationality Act of 1940, 54 Stat. 1137. That section pro-

vided that a claimant whose citizenship was denied by administrative authorities could institute a declaratory judgment suit in the federal courts to determine his right to citizenship, whether he was in the United States or abroad. In addition, the section broadened the venue of such an action by permitting suit to be brought in the "district in which such person claims a permanent residence." Finally, the section provided a method by which a claimant could enter the United States and prosecute his claim personally.[7]

---

[7] Section 503 of the Nationality Act of 1940, 54 Stat. 1137, 1171–1172, provided:

"If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, regardless of whether he is within the United States or abroad, may institute an action against the head of such Department or agency in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. If such person is outside the United States and shall have instituted such an action in court, he may, upon submission of a sworn application showing that the claim of nationality presented in such action is made in good faith and has a substantial basis, obtain from a diplomatic or consular officer of the United States in the foreign country in which he is residing a certificate of identity stating that his nationality status is pending before the court, and may be admitted to the United States with such certificate upon the condition that he shall be subject to deportation in case it shall be decided by the court that he is not a national of the United States. Such certificate of identity shall not be denied solely on the ground that such person has lost a status previously had or acquired as a national of the United States; and from any denial of an application for such certificate the applicant shall be entitled to an appeal to the Secretary of State, who, if he approves the denial, shall state in writing the reasons for his decision. The Secretary of State, with approval of the Attorney General, shall prescribe rules and regulations for the issuance of certificates of identity as above provided."

The legislative history of § 503 indicates that Congress understood the provision for a declaratory judgment action to be merely a confirmation of existing law, or at most a clarification of it.[8] What was concededly novel about § 503 was the provision designed to permit a citizenship claimant outside the United States to be admitted to this country upon a certificate of identity in order personally to prosecute his claim to citizenship, subject to the condition of deportation in the event of an adverse decision. At the time of the enactment of this provision some misgivings were expressed that it might be utilized by aliens to gain physical entry into

---

[8] For example, one of the managers of the bill in the House explained the declaratory judgment provisions as follows:

"We have a rather new situation here, and that is we are cutting off the claim to citizenship of these thousands of persons under this provision in the bill who do not comply with its terms and therefore it was deemed advisable that some chance be given them to have what might be called their day in court. We have safeguarded the situation extremely carefully and feel that so far as possible we have prevented any abuse of it. It was my contention when this measure was up for consideration in the committee that such people did have the right to go into court either on a declaratory judgment or under a writ of habeas corpus, but there was a feeling on the part of others that they may not have that right." 86 Cong. Rec. 13247.

A similar understanding of the measure was indicated during the House Committee Hearings on the bill.

"Mr. FLOURNOY. . . . The question remains, whether while still abroad he would not be able to resort to a petition for declaratory judgment or for a writ of mandamus.

"The CHAIRMAN. I should think, gentlemen, that we ought to go a little step further . . . to say that such person may, upon application, be permitted under certain conditions . . . to enter the United States for a short period of time as a temporary person only." Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess., pp. 291–292.

the United States and then to disappear into the general populace.[9]

In the ensuing years the abuses which some had anticipated did, indeed, develop, and the legislative history of § 360 of the 1952 Act shows that the predominate concern of Congress was to limit the easy-entry provision of § 503 of the 1940 Act, under which these abuses had occurred. Thus the report of the Senate Committee which studied immigration and nationality problems for two and a half years found that § 503 "has been used, in a considerable number of cases, to gain entry into the United States where no such right existed." S. Rep. No. 1515, 81st Cong., 2d Sess., p. 777; see also Joint Hearings before the Subcommittees of the Committees on the Judiciary on S. 716, H. R. 2379 and H. R. 2816, 82d Cong., 1st Sess., pp. 108–110, 443–445. In describing the purpose of the legislation which became § 360 of the 1952 Act the Senate Judiciary Committee, stating that "[t]he bill modifies section 503 of the Nationality Act of 1940," explained that it provides:

> "that any person who has previously been physically present in the United States but who is not within the United States who claims a right or privilege as a national of the United States and is denied such right or privilege by any government agency may be issued a certificate of identity for the purpose of traveling to the United States and applying for admission to the United States. The net effect of

[9] For instance, a representative of the Immigration and Naturalization Service testified at the House Committee hearings that after a citizen claimant had been permitted to enter the United States, "[I]t would be open to question, in my mind, whether you would ever get him out again." Hearings before the House Committee on Immigration and Naturalization on H. R. 6127, superseded by H. R. 9980, 76th Cong., 1st Sess., p. 292; see also, *id.*, at 294, 296.

this provision is to require that the determination of the nationality of such person shall be made in accordance with the normal immigration procedures. These procedures include review by habeas corpus proceedings where the issue of the nationality status of the person can be properly adjudicated." S. Rep. No. 1137, 82d Cong., 2d Sess., p. 50.

As a matter simply of grammatical construction, it seems obvious that the "such person" referred to in the Committee Report is a person who has chosen to obtain a certificate of identity and to seek admission to the United States in order to prosecute his claim. The appellee in the present case is, of course, not such a person.

This legislative history is sufficient, we think, to show that the purpose of § 360 (b) and (c) was to cut off the opportunity which aliens had abused under § 503 of the 1940 Act to gain fraudulent entry to the United States by prosecuting spurious citizenship claims. We are satisfied that Congress did not intend to foreclose lawsuits by claimants, such as Cort, who do not try to gain entry to the United States *before* prevailing in their claims to citizenship.

For these reasons, we hold that a person outside the United States who has been denied a right of citizenship is not confined to the procedures prescribed by § 360 (b) and (c), and that the remedy pursued in the present case was an appropriate one. This view is in accord with previous decisions of this Court concerning the relationship of §§ 10 and 12 of the Administrative Procedure Act to the subsequently enacted Immigration and Nationality Act of 1952. See *Shaughnessy* v. *Pedreiro,* 349 U. S. 48; *Brownell* v. *Tom We Shung,* 352 U. S. 180. The teaching of those cases is that the Court will not hold that the broadly remedial provisions of the Administrative Pro-

cedure Act are unavailable to review administrative decisions under the 1952 Act in the absence of clear and convincing evidence that Congress so intended.

With respect to the other issues presented by this appeal, the case is set for reargument during the October Term, 1962, to follow No. 19.

*It is so ordered.*

MR. JUSTICE BRENNAN, concurring.

While I agree with the reasoning of the Court and join its opinion, I wish to note my view that its interpretation of § 360 of the Immigration and Nationality Act of 1952 is further supported by serious doubt as to whether the statute as construed and applied by the dissenting opinion would be constitutional. Compare, *e. g., United States* v. *Witkovich,* 353 U. S. 194, 201–202.

Necessarily implicit in the administrative denial of a right or privilege of citizenship on the ground that the individual affected has committed an expatriating act enumerated in § 401 of the 1940 Act or § 349 of the 1952 Act, is the assumption that the individual was theretofore a citizen. Accordingly, it follows from the interpretation advanced by the dissent that a person abroad who just prior to the adverse administrative action admittedly had been deemed a citizen, entitled to all the incidents of citizenship including the freedom to re-enter the country, may by unreviewable administrative action be relegated to the status of an alien confronted by all the barriers to alien entry and the limited access to judicial review that an alien enjoys. That Congress may, consistently with the requirements of due process, circumscribe general grants of jurisdiction [1] so as to deny judicial review of administrative action which peremptorily initi-

---

[1] Administrative Procedure Act, 5 U. S. C. § 1009; Declaratory Judgment Act, 28 U. S. C. § 2201.

ates the treatment as an alien of one who had been a citizen seems at least doubtful enough that we should, if reasonably possible, avoid interpreting any statute to accomplish such a result.

If §§ 360 (b), (c) provided the sole avenue to judicial review for one who while abroad is denied a right of citizenship, the following consequences would result: He would have to apply for a certificate of identity, which would be granted only if an administrative official was satisfied that the application was made in good faith and had a substantial basis. If the certificate were initially denied, an administrative appeal would have to be taken. If that failed, an attempt might be made to secure judicial review. A holding that no such review is available would mean that one who admittedly had been a citizen would have been conclusively converted into an alien without *ever* having gained access to *any* court. On the other hand, if review were forthcoming at this stage, and if issuance of a certificate were ordered, the individual would have gained only the right to travel to a United States port of entry—if he could afford the passage—there to be "subject to all the provisions of this chapter relating to the conduct of proceedings involving aliens seeking admission to the United States." He would, in other words, have to submit to detention as an alien although it is assumed that he was once a citizen and no court had ever determined that he had been expatriated. Should he still encounter an administrative denial of the right to enter, he would finally get into court, but "in habeas corpus proceedings and not otherwise," with whatever limitations upon the scope of review such language may imply.

The dissent would construe § 360 to mean that administrative action resulting in such a stark limitation of such fundamental rights is totally unreviewable. For the very procedures of subsections (b) and (c), which according to

the dissent's interpretation are the only avenues to review open to the putative expatriate abroad, accomplish a conversion of citizenship into alienage.   To read Congress as having denied judicial review of administrative action which throws an individual into this bind would be to tread upon a constitutional quicksand.

The dissent finds shelter in *United States* v. *Ju Toy,* 198 U. S. 253, but that case does not resolve the constitutional doubts I have suggested.   The precise issue there was the degree of finality to be accorded in habeas corpus proceedings to an administrative refusal of entry based on a finding that the petitioner was not, as he claimed, native-born and so had never been a citizen.   *Ju Toy* was not an expatriation case in which administrative officials purported to withdraw rights of citizenship which admittedly once existed.   Even if "the mere fact that [persons seeking entry] . . . claimed to be citizens would not have entitled them under the Constitution to a judicial hearing," [2] it does not follow that rights attaching to admitted citizenship may be forfeited without a judicial hearing. To deny the rights of citizenship to one who previously enjoyed them "obviously deprives him of liberty . . . . It may result also in loss of both property and life; or of all that makes life worth living.   Against the danger of such deprivation without the sanction afforded by judicial proceedings, the Fifth Amendment affords protection

---

[2] *Ng Fung Ho* v. *White,* 259 U. S. 276, 282.   See *United States* v. *Ju Toy,* 198 U. S. 253, 261:

"This petition should have been denied . . . , irrespective of what more we have to say, because it alleged nothing except citizenship.   It disclosed neither abuse of authority nor the existence of evidence not laid before the Secretary.   It did not even set forth that evidence or allege its effect.   But as it was entertained and the District Court found for the petitioner it would be a severe measure to order the petition to be dismissed on that ground now, and we pass on to further considerations."

in its guarantee of due process of law. The difference in security of judicial over administrative action has been adverted to by this court." *Ng Fung Ho* v. *White,* 259 U. S. 276, 284–285.

MR. JUSTICE HARLAN, whom MR. JUSTICE FRANK-FURTER and MR. JUSTICE CLARK join, dissenting.

The decision that the District Court had jurisdiction to entertain this declaratory judgment action, notwithstanding that the appellee is a *foreign resident,* seems to me manifestly wrong, in light of the governing statute and its legislative history which could hardly be more clear.

This issue depends upon § 360 of the 1952 Act. That section is entitled: "Proceedings For Declaration of United States Nationality In The Event of [the administrative] Denial of Rights And Privileges as National." The provisions of the section set out in full in the margin,[1] may be summarized as follows:

> (1) If the person whose rights as a national have been administratively denied "is within the United

_____

[1] "(a) If any person who is *within the United States* claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may institute an action under the provisions of section 2201 of title 28, United States Code, against the head of such department or independent agency for a judgment declaring him to be a national of the United States, except that no such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of, or in connection with any exclusion proceeding under the provisions of this or any other act, or (2) is in issue in any such exclusion proceeding. An action under this subsection may be instituted only within five years after the final administrative denial of such right or privilege and shall be filed in the district court of the United States for the district in

States," he may bring a declaratory judgment action under 28 U. S. C. § 2201 to establish his citizenship,[2] unless that issue was, or is, already involved in an "exclusion" proceeding. The action must be brought

which such person resides or claims a residence, and jurisdiction over such officials in such cases is hereby conferred upon those courts.

"(b) If any person who is *not within the United States* claims a right or privilege as a national of the United States and is denied such right or privilege by any department or independent agency, or official thereof, upon the ground that he is not a national of the United States, such person may make application to a diplomatic or consular officer of the United States in the foreign country in which he is residing for a certificate of identity for the purpose of traveling to a port of entry in the United States and applying for admission. Upon proof to the satisfaction of such diplomatic or consular officer that such application is made in good faith and has a substantial basis, he shall issue to such person a certificate of identity. From any denial of an application for such certificate the applicant shall be entitled to an appeal to the Secretary of State, who, if he approves the denial, shall state in writing his reasons for his decision. The Secretary of State shall prescribe rules and regulations for the issuance of certificates of identity as above provided. The provisions of this subsection shall be applicable only to a person who at some time prior to his application for the certificate of identity has been physically present in the United States, or to a person under sixteen years of age who was born abroad of a United States citizen parent.

"(c) A person who has been issued a certificate of identity under the provisions of subsection (b), and while in possession thereof, may apply for admission to the United States at any port of entry, and shall be subject to all the provisions of this Act relating to the conduct of proceedings involving aliens seeking admission to the United States. A final determination by the Attorney General that any such person is not entitled to admission to the United States shall be subject to review by any court of competent jurisdiction in habeas corpus proceedings and not otherwise. Any person described in this section who is finally excluded from admission to the United States shall be subject to all the provisions of this Act relating to aliens seeking admission to the United States." Section 360, 66 Stat. 273–274, 8 U. S. C. § 1503. (Emphasis added.)

[2] Throughout this opinion "nationality" is spoken of as "citizenship."

within five years after the final administrative denial, and in the district where such person resides or claims residence. (Subsection "(a).")

(2) If such person is "not within the United States," but had previously been "physically" there, or was born abroad of an American citizen parent and is under the age of 16, (i) he may apply abroad for a "certificate of identity" to enable him to seek admission to the United States (subsection "(b)"); and (ii) if admission at a port of entry is finally denied him by the Attorney General, he may have that determination judicially reviewed "in habeas corpus proceedings and not otherwise." If ultimately excluded from the United States, such person is made subject to all the provisions of the immigration law relating to the admission of aliens to the United States. (Subsection "(c).")

As will be shown later, these provisions of the 1952 Act, among other things, departed from the comparable procedural provisions of § 503 of the Nationality Act of 1940, 54 Stat. 1137, 1171–1172, which had expressly made declaratory relief available to *all* citizenship claimants, whether "within the United States or abroad," following an administrative denial of that status.[3] The purpose

---

[3] Section 503, 54 Stat. 1171–1172, provides:

"If any person who claims a right or privilege as a national of the United States is denied such right or privilege by any Department or agency, or executive official thereof, upon the ground that he is not a national of the United States, such person, *regardless of whether he is within the United States or abroad,* may institute an action against the head of such Department or agency in the District Court of the United States for the District of Columbia or in the district court of the United States for the district in which such person claims a permanent residence for a judgment declaring him to be a national of the United States. If such person is outside the United States and shall have instituted such an action in court, he may, upon submission of a sworn application showing that the claim of nationality

and effect of the new provisions are shown by the following extract from the Senate Judiciary Committee's report on the bill (S. 2550), § 360 of which, with only a minor addition and deletion,[4] now bears the same number in the 1952 Act:

## "G. DECLARATORY JUDGMENT

"Under the provisions of section 503 of the Nationality Act of 1940 *any* person who claims a right or privilege as a national of the United States and who is denied such right or privilege by a governmental agency on the ground that he is not a national of the United States may institute an action in a district Federal court for a judgment declaring him to be a national of the United States. If such person is outside the United States and shall have instituted the action in court, he may obtain from a diplomatic or consular officer a certificate of identity and may be admitted to the United States with the certificate upon the condition that he shall be sub-

---

presented in such action is made in good faith and has a substantial basis, obtain from a diplomatic or consular officer of the United States in the foreign country in which he is residing a certificate of identity stating that his nationality status is pending before the court, and may be admitted to the United States with such certificate upon the condition that he shall be subject to deportation in case it shall be decided by the court that he is not a national of the United States. Such certificate of identity shall not be denied solely on the ground that such person has lost a status previously had or acquired as a national of the United States; and from any denial of an application for such certificate the applicant shall be entitled to an appeal to the Secretary of State, who, if he approves the denial, shall state in writing the reasons for his decision. The Secretary of State, with approval of the Attorney General, shall prescribe rules and regulations for the issuance of certificates of identity as above provided." (Emphasis added.)

[4] See note 25, *infra*.

ject to deportation in case it shall be decided by the court that he is not a national of the United States.

"The bill modifies section 503 of the Nationality Act of 1940 *by limiting the court action exclusively to persons who are within the United States,* and prohibits the court action in any case if the issue of the person's status as a national of the United States (1) arose by reason of, or in connection with, any deportation or exclusion proceeding or (2) is an issue in any such deportation or exclusion proceeding. The reason for the modification is that the issue of citizenship is always germane in an exclusion and deportation proceeding, in which case an adjudication of nationality status can be appropriately made.

"The bill further provides that any person who has previously been physically present in the United States but who is not within the United States who claims a right or privilege as a national of the United States and is denied such right or privilege by any government agency may be issued a certificate of identity for the purpose of traveling to the United States and applying for admission to the United States. The net effect of this provision is to require that the determination of the nationality of *such person* shall be made in accordance with the normal immigration procedures. These procedures include review by habeas corpus proceedings where the issue of the nationality status of the person can be properly adjudicated." S. Rep. No. 1137, to accompany S. 2550, 82d Cong., 2d Sess., p. 50. (Emphasis added.)

The Court now holds, however, that under § 360 declaratory relief is still available to those "not within the United States" as well as those "within the United States," as was so under § 503 of the 1940 Act; that the certificate of identity procedure provided in sub-

sections (b) and (c) of § 360 is not the exclusive remedy available to nonresident citizenship claimants; that Congress' "predominant concern" in enacting those subsections was to fend against possible misuse of certificates of identity in effecting fraudulent entry into this country; and that jurisdiction of this action accordingly lies under the Declaratory Judgment Act and the Administrative Procedure Act. These conclusions, which I believe are plainly inconsistent with the congressional purpose, as reflected on the face of § 360 itself and in the foregoing Senate Judiciary Committee report, are refuted beyond any doubt by the background and legislative history of § 360.

Prior to 1940, immigration and nationality statutes were silent on the form and scope of judicial review in deportation, exclusion, and nationality cases. In 1905 this Court, in a habeas corpus proceeding involving an administrative denial of admission to this country of a nonresident citizenship claimant who had temporarily departed, held that due process did not require a judicial trial of the issue of citizenship; and that the courts could inquire into the administrative decision only within the conventional limits of habeas corpus review.[5] *United States* v. *Ju Toy,* 198 U. S. 253 (Holmes, J.). In 1922, however, the Court held that a resident claimant in a deportation proceeding *was* entitled to a judicial determination of his citizenship status, thus turning the availability of full judicial relief on the geographical location of the claimant. *Ng Fung Ho* v. *White,* 259 U. S. 276 (Brandeis, J.).

In 1934 the Declaratory Judgment Act was passed. 48 Stat. 955–956; 28 U. S. C. § 2201, as since amended.

---

[5] That is, whether the administrative determination had afforded a fair hearing; whether it was supported by evidence; and whether it had been reached under correct principles of law. See *Ng Fung Ho* v. *White,* 259 U. S. 276, 284.

In a case decided in 1939, this Court held that remedy applicable to resident citizenship claimants, see *Perkins* v. *Elg,* 307 U. S. 325. However, despite the *Elg* decision, and no doubt because of the *Ju Toy* and *Ng Fung Ho* cases, the continuing prevailing view prior to 1940 seems to have been that relief under the Declaratory Judgment Act was not available to nonresidents seeking a determination of their citizenship claims.

It was not until 1940 that Congress, in the Nationality Act of 1940, first specifically dealt with the availability of declaratory relief in nationality cases. Under that statute the requirements for citizenship were greatly tightened and the provisions for loss of citizenship expanded. During the debates concern was expressed lest under existing law some persons might not get their "day in court" with respect to claims to citizenship. 86 Cong. Rec. 13247. This led to the enactment of § 503 under which declaratory relief was made available to resident and nonresident claimants alike, and, in the case of the latter, authorizing, but not requiring, their provisional entry into the United States under certificates of identity, issuable in aid of a declaratory judgment suit already filed. Note 3, *supra.*

At the same time Congress recognized the possibility of abuse of this liberalized procedure on the part of nonresident claimants who might seek certificates of identity only to achieve entry into this country, without any thought of pressing their citizenship claims; and an attempt was made to guard against such abuse. Accordingly, the section was written to provide that certificates of identity should be furnished only upon "a sworn application showing that the claim of nationality presented in such [declaratory judgment] action is made in good faith and has a substantial basis"; it also authorized the Secretary of State, with the approval of the Attorney Gen-

eral, to prescribe regulations for the issuance of such certificates.[6]   Note 3, *supra.*

Commencing soon after the close of World War II, and perhaps in part as a result of the then recent repeal of the Chinese Exclusion Act and continuing Communist successes in China, a large number of suits were filed in the federal courts by Chinese citizenship claimants. These carried in their wake consequences which Congress could hardly have fully anticipated when it enacted § 503.   Such consequences were principally of three kinds. *First,* there was an increase in the volume of fraudulent entries into this country; many Chinese who had obtained certificates of identity incident to the institution of a declaratory judgment citizenship action would abandon the suit upon arrival here and disappear into the stream of the population.   *Second,* the courts experienced difficulty in adjudicating "derivative" citizenship claims without the claimants having been first exposed to normal immigration screening; such claims were often based on the assertion that the claimant was the foreign-born child of an American citizen who had temporarily returned to China, an assertion frequently difficult to disprove.   *Third,* the federal court dockets became cluttered with these suits.   See, *e. g., United States ex rel. Dong Wing Ott* v. *Shaughnessy,* 116 F. Supp. 745, 751–752, aff'd, 220 F. 2d 537; *Mar Gong* v. *McGranery,* 109 F. Supp. 821, rev'd *sub nom. Mar Gong* v. *Brownell,* 209 F. 2d 448.   By the end of 1952, 1,288 such cases had been instituted.   See *Ly Shew* v. *Acheson,* 110 F. Supp. 50, 54–55, vacated and remanded *sub nom. Ly Shew* v. *Dulles,* 219 F. 2d 413;

---

[6] It was an effort to allay the doubts of those who, on the one hand, wished to assure a full judicial remedy to all citizenship claimants, and of those who, on the other, feared the possible abuse of such a remedy, that led to the remarks of one of the managers of the House bill (Representative Rees), quoted in note 8 of the Court's opinion, *ante,* p. 377.   See 86 Cong. Rec. 13247.

Annual Reports of the Attorney General for 1956 (pp. 111–113) and 1957 (pp. 121–123). This state of affairs contributed in no small degree to the revamping of § 503 by § 360 of the statute now before us, enacted after five years of investigation pursuant to a 1947 Senate Resolution authorizing a general study of the immigration laws. S. Res. No. 137, 80th Cong., 1st Sess. (1947).

The first step in this direction occurred in 1950 when Senator McCarran introduced S. 3455, § 359 of which, entitled "Judicial Proceedings for Declaration of United States Nationality in the Event of Denial of Rights and Privileges as a National," [7] was the earliest version of what ultimately became § 360 of the 1952 Act. Section 359 provided declaratory relief *only* for "any person in the United States." The Senate Report [8] accompanying that bill, after observing that § 503 of the 1940 Act permitted persons "within or without" the United States to file declaratory judgment suits, went on to say of proposed new § 359:

> "In spite of the definite restrictions on the use and application of section 503 to bona fide cases [see *supra,* pp. 389–390], the subcommittee finds that the section had been subject to broad interpretation, and that it has been used, in a considerable number of cases, to gain entry into the United States where no such right existed. . . . The subcommittee therefore recommends that *the provisions of section 503* as set out in the proposed bill be *modified to limit the privilege to persons who are in the United States . . . .*" (Emphasis added.)

Read in connection with this report it is surely beyond doubt that the § 503 "privilege" which was intended to be changed was not merely the right to a certificate of

---

[7] S. 3455, 81st Cong., 2d Sess., § 359, pp. 239–240 (1950).

[8] S. Rep. No. 1515, 81st Cong., 2d Sess., pp. 776–777 (1950).

identity, which, under the existing statute, was an optional, not a necessary, appurtenance of a declaratory judgment suit, but the right of one abroad to maintain such a suit itself. Since a person "in" the United States had no need for a certificate of identity, the "privilege" limited by this bill to persons "in" the United States can only mean the privilege of bringing a declaratory suit. In other words, the new proposal did not view the "entry" problem as something that could be dealt with independently of the character of the judicial remedy to be afforded those administratively denied citizenship.[9] This, as will be seen, remained in the forefront of the subsequent legislative discussions.

Early in the following year three additional bills were placed before the Congress, one in the Senate and two in the House. S. 716,[10] a revision of the earlier McCarran bill, and H. R. 2379,[11] introduced by Representative Walter, both provided for "citizenship" declaratory relief only as to persons "within the United States." The third, H. R. 2816,[12] introduced by Representative Celler, afforded such relief to "any person" (making no reference to location), and in other respects was also substantially like existing § 503.

In the ensuing Joint Hearings on these bills [13] attention became sharply focused on the question of what, if

---

[9] This was the view of the Immigration and Naturalization Service, which in reporting on this bill stated that the new section was designed to "replace section 503" authorizing a nonresident citizenship claimant "to come to this country *after filing such a suit* in order to prosecute it to a conclusion." See Legislative History, Immigration & Nationality Act, 82d Cong., Vol. 5 (Analysis of S. 3455), pp. 359-1 to 359-2. (Emphasis added.)

[10] S. 716, 82d Cong., 1st Sess., § 360, p. 262 (1951).

[11] H. R. 2379, 82d Cong., 1st Sess., § 360, pp. 263–264 (1951).

[12] H. R. 2816, 82d Cong., 1st Sess., § 360, pp. 260–261 (1951).

[13] Joint Hearings before the Subcommittees of the Committees on the Judiciary on S. 716, H. R. 2379, and H. R. 2816, 82d Cong., 1st Sess. (1951). (Hereafter Joint Hearings.)

any, judicial relief (other than habeas corpus) should be available to nonresident citizenship claimants. The most revealing points of view are found in the statements submitted on behalf of the Departments of State and Justice.[14] While both Departments took the position that some such relief should be afforded nonresidents,[15] their proposals were quite different. State suggested declaratory relief for persons abroad limited to those whose *original* citizenship status was not in doubt, but who were deemed to have *lost* it; and that certificates of identity should be made available to such persons, on an optional basis, to permit their coming to this country in aid of their suits.[16] Justice, on the other hand, recommended that all nonresidents whose claims to citizenship were not frivolous should be required to obtain a special certificate of identity, or its equivalent, so as to permit them to come to this country to test their claims in accordance with normal immigration procedures.[17]

---

[14] A large number of "lay" witnesses expressed their views before the Joint Committee. All were highly critical of the McCarran and Walter bills which afforded no declaratory remedy to nonresident citizenship claimants, but most had not heard of the so-called "Chinese derivative suit" and other problems experienced under § 503. (*Supra,* pp. 390–391.) On the other hand, it is entirely evident from the questioning of all witnesses that the problem which was uppermost in the minds of the committee members on this aspect of the bills was how best to afford adequate judicial relief to nonresidents under tight controls which would minimize the dangers of abuse. Joint Hearings, pp. 106–109, 338–339, 443–444, 522.

[15] The State Department representative noted that the proposed McCarran bill "withdraws from all persons abroad the right to obtain the judicial review of their claims of citizenship which is granted to them by section 503 of the Nationality Act of 1940." Joint Hearings, p. 710. The representative of the Department of Justice described matters in the same vein. Joint Hearings, p. 720.

[16] Joint Hearings, p. 710.

[17] The Department's statement read:

"The Department of Justice objects to the enactment of section 360 unless it is amended to provide for the protection of *persons*

However, it is evident that the proposals of both State and Justice were intended to fill the remedial gap in S. 716 respecting nonresidents; that they contemplated either limiting, or entirely doing away with, the unrestricted declaratory relief available to nonresidents under § 503 of the 1940 statute; that they were envisaged as constituting the *exclusive* remedy for those living abroad; and that they negative any idea that one so situated was to have the choice between such procedures and the general remedies provided by the Declaratory Judgment Act or the Administrative Procedure Act.

Following the Joint Hearings, the McCarran bill, S. 716, was redrawn as S. 2055,[18] and the Walter bill, H. R. 2379, was revised as H. R. 5678,[19] in consultation with representatives of the State and Justice Departments.[20] The

*abroad* who have more than a frivolous claim to citizenship but who are unable to obtain a United States passport. To protect such persons the Department recommends adding to section 360 language which would permit the issuance to such persons of a special certificate of identity or a special 'visa.' That document should be described in such a manner as merely to authorize the person in question to proceed to a port in the United States and apply for admission as a national, in the usual manner. . . . However, the intent of this suggestion is that the person claiming citizenship shall be required to apply for admission to the United States at a port of entry and go through the usual screening, interrogation, and investigation, applicable in the cases of other persons seeking admission to the United States, so that the Immigration and Naturalization Service will have as complete a record as possible on each person entering this country claiming to be a national thereof." Joint Hearings, p. 721. (Emphasis added.)

[18] S. 2055, 82d Cong., 1st Sess., § 360, pp. 277–279 (1951).

[19] H. R. 5678, 82d Cong., 1st Sess., § 360, pp. 150–152 (1951). The Celler bill, H. R. 2816, which, like § 503, proposed a judicial remedy for both resident and nonresident citizenship claimants, scarcely figured in the Joint Hearings discussion.

[20] "Following the joint hearings and in the course of numerous conferences attended by advisers representing unofficially the Departments of State and Justice, two modified versions of the above-

revised McCarran bill adopted the Department of Justice proposals, in effect limiting the judicial remedy for testing nonresident citizenship claims to that afforded in connection with "exclusion" cases, that is habeas corpus.[21] The new Walter bill was in effect a combination of existing § 503 and the suggestions of the State Department.[22] That bill was eventually passed by the House.[23] The McCarran bill, except for two minor deletions,[24] was

mentioned three bills [S. 716, H. R. 2379, H. R. 2816] were introduced . . . ." H. R. Rep. No. 1365, to accompany H. R. 5678, 82d Cong., 2d Sess., p. 28 (1952).

[21] It should be noted that there was added to what in the final result became subsection (a) of § 360, relating to resident claimants, a specific reference to 28 U. S. C. § 2201, the Declaratory Judgment Act, which had not been in § 503. No reference to 28 U. S. C. § 2201 was included in what ultimately became subsection (b).

[22] Whereas the State Department had proposed that declaratory relief, as to nonresidents, should be limited to those who had *lost* their American citizenship, the Walter bill provided declaratory relief for any claimant abroad, but limited eligibility for a certificate of identity to those who had been "physically" in the United States at some prior time, or to a person who was born abroad of an American-citizen parent and who wished to come to the United States to meet residential requirements for the retention of citizenship. After a declaratory action was filed, the bill provided that the claimant "may" make application for a certificate of identity "for the purpose of traveling to the United States to prosecute his action for determination of his citizenship status."

[23] At p. 22 of his brief before this Court the appellee, Cort, quotes extensively from the House Report which accompanied H. R. 5678—H. R. Rep. No. 1365, 82d Cong., 2d Sess., pp. 87–88 (1952)— to support his contention that present § 360 was not designed to prohibit a suit for a declaratory judgment by a nonresident claimant, but only to limit the use of certificates of identity to gain entry in this country. However true this may be as to § 360 of H. R. 5678, Cort's reliance on that bill is misplaced since the House bill was rejected in conference and the Senate version of § 360 was eventually passed by both Houses and became law.

[24] A qualifying phrase, "as a national of the United States," was deleted from subsections (b) and (c).

reported out by the Senate Judiciary Committee as S. 2550 and passed by the Senate. *Supra,* pp. 386–387.

Congress, thus squarely faced with making, or not making, declaratory relief available to nonresident citizenship claimants, chose the latter course. It accepted S. 2550,[25] the judicial remedy provisions of which became § 360 of the Immigration and Nationality Act of 1952. Note 1, *supra.*

In light of this unambiguous course of events, I do not understand how the Government's contention that the District Court lacked jurisdiction over this declaratory judgment action can be successfully challenged, the appellee at all relevant times having resided abroad. To say the least, the Court's contrary conclusion seems to me to rest on the most insecure kind of reasoning.

Certainly, the past cases in this Court lend no support to this decision. *Perkins* v. *Elg,* 307 U. S. 325, holding that a *resident,* threatened with deportation, could maintain a declaratory judgment action to establish citizenship, was of course quite in line with *Ng Fung Ho* v. *White, supra.* Moreover, the case was decided in 1939, before Congress, for the first time, addressed itself to the availability of declaratory relief in nationality cases. *Supra,* p. 389. *McGrath* v. *Kristensen,* 340 U. S. 162, is even more inapposite. The issue there was simply whether, in the circumstances involved, an alien then in this country was eligible for naturalization, so that the

---

[25] The conferees modified § 360 of S. 2550 in two minor respects. In subsection (a), a reference to "deportation proceedings" was deleted, so that the disability to bring declaratory relief for a person "within the United States" was limited only if the issue of nationality arose in an "exclusion" proceeding. (Compare note 1 and text accompanying note 2, *supra,* with S. Rep. No. 1137, *supra,* pp. 386–387.) In subsection (b) "a person under sixteen years of age who was born abroad of a United States citizen parent" was also made eligible for a certificate of identity. (Compare note 1 with S. Rep. No. 1137, *supra,* pp. 386–387.)

Attorney General had power to stay his deportation. The Court noted that § 503 of the 1940 Act was not available to the alien, since his citizenship status was not in issue. Incidentally, the Court did not reach the applicability of the Administrative Procedure Act. *Flemming* v. *Nestor,* 363 U. S. 603, involved a nonresident alien's right to social security benefits, not citizenship.[26]

*Shaughnessy* v. *Pedreiro,* 349 U. S. 48, and *Brownell* v. *Tom We Shung,* 352 U. S. 180, the two cases relied on by the Court as supporting the applicability of the Administrative Procedure Act in this instance, were, respectively, simply straightforward deportation and exclusion cases, neither involving a citizenship claim. Unlike the sections in the 1952 Act relating to nationality, those governing deportation and exclusion then had no specific provisions dealing with judicial relief,[27] and unlike this case, the relief in those cases was sought only after the administrative process had run its full course, and a "final" determination had been made by the Attorney General.

When it comes to § 360 itself and the legislative history of the section, the Court's analysis is, if anything, even

---

[26] In addition to *Flemming* v. *Nestor,* the Court cites two opinions from the District of Columbia Circuit, *Stewart* v. *Dulles,* 101 U. S. App. D. C. 280, 248 F. 2d 602; *Bauer* v. *Acheson,* 106 F. Supp. 445, in support of its sweeping statement that "the fact that the plaintiff is not within the United States has never been thought to bar an action for a declaratory judgment of this nature." If the phrase "of this nature" is intended to refer to citizenship claims, the two cases are inapposite since neither determined citizenship; in both cases the issue was whether the State Department could refuse to renew a passport, except for the limited purpose of returning to this country, without affording a hearing. Moreover, taking that phrase as referring to citizenship claims, compare both the decision of the District Court in the present case, 187 F. Supp. 683, and *Tom Mung Ngow* v. *Dulles,* 122 F. Supp. 709, with *D'Argento* v. *Dulles,* 113 F. Supp. 933.

[27] This is not so now. See the 1961 amendments to the Immigration and Nationality Act of 1952, note 28, *infra.*

more cursory and unpersuasive. The Court initially finds that the declaratory judgment provision respecting nonresidents, contained in the predecessor of § 360— § 503 of the 1940 Act—was understood "to be merely a confirmation of existing law, or at most a clarification of it." In this, the Court has overlooked the *Ju Toy* and *Ng Fung Ho* cases which of course indicate precisely the contrary. *Supra,* p. 388, and note 6.

Proceeding from that premise, and despite the unequivocal directive in subsection (c) of § 360 that a final determination of the Attorney General denying admission to a citizenship claimant shall be subject to judicial review "in habeas corpus proceedings and not otherwise," the Court concludes that such is not indeed the exclusive remedy. This is said to be so because § 360 provides only that the claimant "may" apply abroad for a certificate of identity (subsection (b)), and upon arrival at our shores "may" apply for admission (subsection (c)). This conclusion is supported only by a quotation from the District Court's opinion in this very case. It cannot withstand the statute and legislative history already discussed.

Finally, the Court considers that Congress' "predominate concern" in enacting subsections (b) and (c) of § 360 was with fraudulent entry, not judicial remedies. It is said that this "seems obvious" because the phrase "such person," contained in the extract quoted by the Court from the Judiciary Committee Report on S. 2550 (*ante,* pp. 378–379), refers grammatically only to those persons who had elected to pursue the certificate of identity procedure in prosecuting their citizenship claims. But this conclusion also will hardly stand up when the full text of the Judiciary Committee Report, especially the clause "The bill modifies section 503 of the Nationality Act of 1940 by limiting the court action exclusively to persons who are within the United States . . . ," is read (*supra,* p. 387), and the relevant legislative history is considered.

In deciding the jurisdictional issue as it has, I fear that the Court has become the victim of the manner in which it has put that issue to itself:

> "More precisely stated, the question in this case is whether, despite the liberal provisions of the Administrative Procedure Act, Congress intended that a native of this country living abroad must travel thousands of miles, be arrested, and go to jail in order to attack an administrative finding that he is not a citizen of the United States."

But to sustain the Government's position on this issue it is not necessary to find that Congress, in enacting § 360, suddenly became severe, irrational, or capricious. As a result of the unfavorable experience with § 503 of the 1940 Act, Congress simply restored, with some alleviations, what until 1940 had been the procedure in such cases—a procedure whose constitutionality had long since been upheld by this Court with the firm support of such men as Holmes and Brandeis, JJ. And in so doing Congress acted only after the fullest inquiry, debate, and deliberation.

I am unable to grasp how the Court could have reached the conclusion that the present declaratory action is not precluded by § 360, except by making its own wish father to the thought.[28]

---

[28] It is not without irony that less than a year ago Congress, with the support of the Department of Justice, acted to tighten still further the Immigration and Nationality Act of 1952. Public Law 87–301, 75 Stat. 650 (effective October 26, 1961), amending the 1952 Act in various respects, among other things makes habeas corpus the sole judicial remedy in exclusion proceedings, thereby in effect rejecting *Brownell* v. *Tom We Shung, supra,* which had held the Administrative Procedure Act also available in such cases. See 8 U. S. C. § 1105a (Supp. III 1962); H. R. Rep. No. 1086, 87th Cong., 1st Sess., pp. 22–33 (1961).