**STATE OF ILLINOIS, DEPARTMENT OF PUBLIC AID, Petitioner,**

v.

**Richard S. SCHWEIKER, Secretary, and the United States Department of Health and Human Services, Washington, D.C., Respondents.**

Nos. 82–1175, 82–1752.

United States Court of Appeals, Seventh Circuit.

Submitted March 17, 1983.

Decided May 6, 1983.

Ellen P. Brewin, Asst. Atty. Gen., Chicago, Ill., for petitioner.

Susanne M. Lee, U.S. Dept. of Health & Human Services, Washington, D.C., for respondents.

Before BAUER, CUDAHY and POSNER, Circuit Judges.

POSNER, Circuit Judge.

The Secretary of Health and Human Services has moved to dismiss these two petitions, filed by the State of Illinois and seeking judicial review of orders disallowing federal reimbursement for certain Medicaid expenditures made by the state. The ground for the Secretary's motion is that judicial review of such orders may be obtained, if at all, only in federal district court (with a right of appeal to this court of

course), and not in this court directly. We originally set the motion for oral argument, but when Illinois filed a brief in which it stated that it agreed with the Secretary that we did not have jurisdiction we decided oral argument would not be helpful. Nevertheless, since the question is jurisdictional the agreement of the parties does not bind us, and since it has been answered in different ways in different circuits it merits discussion.

If a state wants to participate in the Medicaid program—wants, that is, to obtain federal money to provide medical services to poor people—it must submit to the Secretary of Health and Human Services a plan that conforms to the requirements of 42 U.S.C. § 1396a. Within 90 days the Secretary must decide whether the plan does conform. 42 U.S.C. § 1316(a)(1). If he decides it does not, he must on the state's demand hold a hearing to reconsider his decision. § 1316(a)(2). The decision on reconsideration is the Secretary's "final determination," and a state that does not like it may file a petition for review in a federal court of appeals. § 1316(a)(3). Also reviewable under this subsection is a final determination under 42 U.S.C. § 1396c to shut off all Medicaid funds to a state either because "the plan has been so changed that it no longer complies" with the provisions of section 1396a or because "in the administration of the plan there is a failure to comply substantially with any such provision."

▆ Section 1316(d) entitles the state to seek reconsideration whenever the Secretary "determines that any item or class of items on account of which Federal financial participation is claimed ... shall be disallowed for such participation." Nowhere does the statute make provision for judicial review of disallowances, so if the orders that Illinois has petitioned us to review are disallowance rather than plan-nonconformity orders we do not have jurisdiction under section 1316(a)(3). If there is any jurisdiction to review these orders it would be in federal district court under one of the general district court jurisdictional statutes, such as 28 U.S.C. § 1331 (federal-question

jurisdiction); Illinois has filed a district court suit under 28 U.S.C. § 1331 in case we lack jurisdiction.

The first petition for review, No. 82–1175, challenges the disallowance of reimbursement for expenditures on services provided at nine nursing homes that HHS decided were "institutions for mental diseases" and hence excluded by federal law from the Medicaid program. See 42 U.S.C. § 1905(a)(15)(B). The second, No. 82–1752, challenges the disallowance, based on the Hyde Amendment, see *Harris v. McRae,* 448 U.S. 297, 304, 100 S.Ct. 2671, 2681, 65 L.Ed.2d 784 (1980), of reimbursement of the costs of certain abortions. HHS's Departmental Grant Appeals Board upheld both disallowances after full hearings in which appeals from several states were consolidated because the same legal issues were involved. Unless the decisions are vacated on judicial review the amount of the disallowed reimbursement will be deducted pursuant to 45 C.F.R. § 201.14(e) from future requests by Illinois (and the other states) for federal Medicaid reimbursement.

If section 1316 is read literally, we lack jurisdiction. The Secretary made no determination of nonconformity within 90 days of the submission of Illinois' plan or of any amendment to the plan, which for purposes of section 1316(a) would count as a plan submission, see 1316(b); nor did he shut off Medicaid funds upon a determination that Illinois' plan had been changed or was being administered in such a manner that it was no longer conforming; and these are the only types of determination that section 1316(a)(3) makes reviewable directly in the court of appeals. The Secretary made a different kind of determination: he disallowed specific items of expenditure—the procedure described in 1316(d).

The main objection to reading section 1316 literally is that it seems to give the Secretary the power unilaterally to decide whether a state can get judicial review of his determinations directly in the court of appeals or must first go to district court. If he wanted to make the state go the latter route, all he would have to do, it might

appear, is pronounce the state's plan conforming—thereby barring the state from going to the court of appeals under section 1316(a)(3)—and then later disallow the reimbursements sought by the state in accordance with the plan. Such a power would take on a sinister hue if the district court turned out not to have jurisdiction to review disallowances. This position has some support in remarks of—more accurately, quoted by—Senator Javits, 111 Cong.Rec. 3068 (1965); in the absence from the committee reports' otherwise detailed discussion of judicial review of any suggestion that disallowance orders are reviewable in any court, S.Rep. No. 404, 89th Cong., 1st Sess. 150–51 (1965); H.Rep. No. 213, 89th Cong., 1st Sess. 131–32 (1965), U.S.Code Cong. & Admin.News 1965, p. 1943; and in a dictum in *State Dept. of Public Welfare of Texas v. Califano,* 556 F.2d 326, 329 and n. 4 (5th Cir.1977)—although *County of Alameda v. Weinberger,* 520 F.2d 344 (9th Cir.1975), holds, and at present the Secretary of HHS concedes (though the concession cannot bind us), that review may be had in the district court.

Another objection to the literal reading of section 1316 is that while routing judicial review through the district court makes good sense when a disallowance takes the form of an auditor's exception made without a hearing or written record—which may have been what Congress thought would be the typical case under section 1316(d), see S.Rep. No. 404, *supra,* at 151; H.Rep. No. 213, *supra,* at 132—the procedure that has actually been adopted by the Secretary, see 45 C.F.R. § 201.14(d) and Appendix to § 201.14, and followed in this case, has the effect of requiring that any decision to disallow a reimbursement be made by the Departmental Grant Appeals Board on the basis of a full written record. There is no need for a district court to reconstruct the administrative record and hence no reason for another tier of judicial review between the Departmental Grant Appeals Board and us. Cf. *Denberg v. United States Railroad Retirement Bd.,* 696 F.2d 1193, 1196 (7th Cir.1983).

Although it therefore might be a good idea to make disallowances judicially reviewable in the same manner as determinations of plan nonconformity—that is, directly in the courts of appeals—this result cannot be brought about without ignoring section 1316(d) entirely, though we acknowledge that Congress might have wanted that result if it had known that every disallowance would be based on a formal record. Even the Third Circuit, which has gone the furthest toward merging disallowance determinations into determinations of plan nonconformity, see *State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1262, 1275–78 (3d Cir.1981); *State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1284, 1290–94 (3d Cir.1982), has drawn the line where the Secretary denied reimbursement for services provided by a single improperly certified nursing home, and has held that review of that denial could not be obtained in the court of appeals directly. *State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1300, 1302–04 (3d Cir. 1982); see also *State of Georgia, Dept. of Human Resources v. Califano,* 446 F.Supp. 404, 413 (N.D.Ga.1977); *Solomon v. Califano,* 464 F.Supp. 1203 (D.Md.1979); *Wingate v. Harris,* 501 F.Supp. 58, 63 (S.D.N.Y.1980). We are stuck with having to distinguish disallowances from determinations of plan nonconformity—just as we are stuck with having to distinguish ICC orders "for the payment of money or the collection of fines, penalties, and forfeitures," which may be challenged only in district court, 28 U.S.C. § 1336(a), from other ICC orders, which may be challenged only in the court of appeals, 28 U.S.C. §§ 2321(a), 2342(5). See *Pullman-Standard v. ICC,* 705 F.2d 875 (7th Cir.1983). The challenge is to come up with a workable distinction between nonconformity and disallowance determinations.

A preliminary issue is whether the district courts have jurisdiction to review disallowances. If they do, it becomes less critical whether we define determination of plan nonconformity, the only determination we can review directly under 42 U.S.C. § 1316(a)(3), broadly or narrowly—but not

inconsequential. The more broadly we construe section 1316(a)(3), the more we simplify judicial review of Medicaid determinations by eliminating an extra tier of review and thereby reducing the burdens on our harried district judges in a class of cases where there is no need to involve the district courts, since a full record will already have been made before the Departmental Grant Appeals Board. Routing judicial review through the district court has another consequence—a serious one in the present period of budgetary stringency for both state and federal governments: the Secretary gets to hold on longer to money that may really belong to a state.

 As the two petitions for review before us illustrate, disallowances are frequently ordered as a result of a legal determination of the sort usually made in the final instance by a court rather than an executive department—a determination of the scope of the Hyde Amendment, or of the meaning of the statutory expression "institution for mental diseases." The nature of the determination, the fact that it is made on a formal record compiled in a trial-type proceeding, and the substantial stakes (more than $5 million in these two cases) all make it unlikely that Congress, if it had thought about the question of judicial review, would have wanted the Department to have the final say. Nothing much can be inferred from the fact that Congress did not specify a method for judicial review of disallowances, even though earlier in section 1316 it had specified such a method for determinations of plan nonconformity. Not every silence is pregnant; *expressio unius est exclusio alterius* is therefore an uncertain guide to interpreting statutes, as the Supreme Court reminded us just the other day. See *Herman & MacLean v. Huddleston,* —— U.S. ——, —— n. 23, 103 S.Ct. 683, 690 n. 23, 74 L.Ed.2d 548, 558 n. 23 (1983); see also *Donovan v. Fall River Foundry Co.,* 696 F.2d 524, 526 (7th Cir. 1982). Of course, whatever we may think of this maxim as an original matter, if Congress in enacting section 1316 thought courts would follow it—thought that we would attach significance to Congress' omit-

ting to provide expressly for judicial review of one type of administrative determination while providing expressly for judicial review of another type—we would have to follow it; it would be one of the premises of the legislation. But *expressio unius* was not much in fashion in 1965, and, in any event, if we were to attribute to Congress knowledge of legal doctrine so comprehensive as to include the canons of statutory construction we would also have to attribute to it knowledge of the presumption that final agency action is reviewable in district court if no specific method of judicial review is prescribed by statute. See 5 U.S.C. § 703; *Rusk v. Cort,* 369 U.S. 367, 371–72, 82 S.Ct. 787, 790–791, 7 L.Ed.2d 809 (1962); *Abbott Laboratories v. Gardner,* 387 U.S. 136, 140, 87 S.Ct. 1507, 1510, 18 L.Ed.2d 681 (1967); *National Ass'n of Home Health Agencies v. Schweiker,* 690 F.2d 932, 936, 940 (D.C.Cir.1982).

As for Senator Javits' remarks, all he said (actually, quoted) was that "to involve audit exceptions or issues other than those of plan-conformity in the judicial review process would create many additional problems." It is unclear that the reference is to anything other than the judicial review procedure established by section 1316(a)(3). Finally, Congress' focus on judicial review of plan-nonconformity determinations is readily understandable in light of the drastic consequences of such a determination—the cut-off of all federal Medicaid funds to the state under 42 U.S.C. § 1396c. Congress wanted to make sure that states could get prompt judicial review of such determinations in the courts of appeals, but did not trouble itself about the method of judicial review of determinations that would result merely in disallowing reimbursement of specific expenditures.

 We conclude that district courts have jurisdiction to review disallowances. This conclusion reduces the pressure for an expansive interpretation of section 1316(a)(3) and brings to center stage the practical consideration that jurisdictional lines should be clearly marked. A litigant

ought to know whether he belongs in the district court or the court of appeals. Although the most cataclysmic consequence of mistaking the court that has jurisdiction—finding out that you are in the wrong court after the time to appeal to the right one has run out—can be avoided in cases like this by filing petitions for review in both courts, as Illinois did here, that is not a satisfactory solution. If we dismiss these petitions on jurisdictional grounds we shall still have to entertain appeals from whatever decision the district court makes (if the losing party appeals), so that in the end there will not be two judicial proceedings—one in the district court and one in the court of appeals—but three. If we do not act on the petitions but treat them as protective only, and the state proceeds to judgment in the district court only to find out later that it really belonged in this court, the district court proceeding will have been a waste of time and resolution of the controversy will simply be delayed.

■ So we want a clean line; and the cleanest is between determinations that the Secretary himself (or at this writing, herself) denotes as determinations of plan nonconformity (or, what is the same thing for purposes of section 1316(a)(3), shutoffs of funds for noncompliance) and determinations that he denotes as disallowances. The only danger, as we have said, is that the Secretary might not object to a nonconforming plan when it was first submitted but might wait till the state requested reimbursement under the plan and then disallow the request, which would force the state into district court and defeat its right to immediate review in the court of appeals. But we doubt, on several grounds, that this is much of a danger. The Secretary does not have an unlimited budget for litigation, and litigating in two courts is more expensive than litigating in one. Moreover, it is not at all clear that having made an initial determination of plan conformity the Secretary could in effect reverse it, despite the absence of any changed circumstances, when he later received requests for reimbursement from the state for expenditures made in strict conformity with the approved plan. The statute and regulations do not appear to authorize such an about-face, and the principles of estoppel, even if narrowly construed when asserted against the government, see generally Davis, Administrative Law of the Seventies §§ 17.-01–.04 (1976), would weigh heavily against permitting it. Furthermore, the Secretary gives up a lot when he takes the disallowance rather than the plan-nonconformity route. He gives up the chance to shut off all federal Medicaid funds to the offending state. This is a more powerful sanction than disallowing specific expenditures, which normally are small fractions of the state's total federal Medicaid receipts. The $5 million at stake in these two cases is little more than half of one percent of the total Medicaid reimbursements that Illinois receives from the federal government. See Medicare & Medicaid Guide ¶ 14905 at pp. 6473–74 (1982). If the Secretary wants to impose the heavy sanction of shutting off all federal Medicaid funds to the state, he pays a rather small price, maybe no price, in having to litigate the propriety of his action directly in this court rather than on appeal to this court from an initial review proceeding in the district court.

Yet at some point the specific expenditure disallowed might be such a big fraction of the state's total receipts of federal Medicaid money that the disallowance would have almost the same effect as a complete shutoff of the money; and this possibility has led other courts besides the Third Circuit to use a functional rather than literal approach to interpreting section 1316(a)(3). See *Texas Department of Public Welfare v. Califano, supra; Medical Services Administration v. United States,* 590 F.2d 135 (5th Cir.1979); *Commonwealth of Massachusetts v. Departmental Grant Appeals Bd.,* 698 F.2d 22 (1st Cir.1983). The trouble is that the functional approach is complicated and therefore uncertain in application—a serious weakness in a jurisdictional test. This is the First Circuit's test: "First, we consider whether the matter might have fit comfortably within the statutory language of section 1396c, as a determination of non-

compliance, if the Secretary had chosen that route. Second, we ask whether it is of such a character, by reason of its generality and importance, as to point towards inclusion under the compliance rather than the disallowance rubric. And, last, we look at the Secretary's chosen procedures and label—not as definitive but as entitled to some respect." *Id.* at 27. It took the First Circuit several pages of dense analysis in the crowded pages of F.2d applying its test to conclude that what the Secretary had called a disallowance really was one. We prefer the simpler approach apparently followed by the Sixth and Ninth Circuits, see *Department of Public Health v. Departmental Grant Appeals Bd.,* 672 F.2d 916 (6th Cir.1981) (mem.); *State of Washington, Dept. of Social & Health Services v. Schweiker,* No. 81–7414 (9th Cir. Sept. 29, 1981), though the Third Circuit has questioned the meaning of these cryptic unpublished orders. See *State of New Jersey v. Department of Health & Human Services,* 670 F.2d 1262, 1273 n. 10 (3d Cir.1981). Under that approach, if the Secretary processes a matter as a disallowance matter, as he did in the cases before us, the court of appeals has no jurisdiction.

Maybe there should be an exception if the practical effect of the disallowances is to shut off all or most of the money that the state is entitled under its plan to receive from the federal government; conceivably, though in light of our earlier discussion improbably, some such safety valve may be necessary to prevent the Secretary from evading the scheme of judicial review created by the statute. But we need not decide in this case whether such a safety valve can and should be read into section 1316(a)(3); it would not come into play here. Since any broader dispensation from a literal reading of the statute would create undue and unnecessary uncertainty in an area—jurisdiction—where certainty is a most important consideration in statutory interpretation, the petitions for review are

DISMISSED.