STATE OF ILLINOIS by the ILLINOIS
DEPARTMENT OF PUBLIC
AID, Plaintiff,

v.

Margaret HECKLER, Secretary of
Health and Human Services,
Defendant.

No. 85 C 359.

United States District Court,
N.D. Illinois, E.D.

Aug. 23, 1985.

Barbara Greenspan, Chicago, Ill., for plaintiff.

Mary Rigdon, U.S. Atty., Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Invoking federal-question jurisdiction under 28 U.S.C. § 1331, the State of Illinois ("Illinois") seeks judicial review of the disallowance by Secretary Margaret Heckler ("Secretary") of the United States Department of Health and Human Services ("HHS") of reimbursement claimed by Illinois under Title XX of the Social Security Act (the "Act"), 42 U.S.C. §§ 1397–1397f.[1] Each party has moved for summary judgment under Fed.R.Civ.P. ("Rule") 56. For the reasons stated in this memorandum opinion and order, Secretary's motion is granted and Illinois' motion is denied.

1. Act citations will refer to the section numbering in Title 42, not to the internal numbering of the statute.

2. There is no real dispute as to the facts (but see n. 13 as to certain disputed exhibits tendered by Illinois dehors the administrative record this Court is called upon to review). Even so, the need on cross-motions under Rule 56 to draw all reasonable factual inferences against each

*Facts*[2]

Illinois has long provided free educational services for handicapped children, consistent with the declaration in Ill. Const. art. X, § 1 that every Illinois child has the right to a "free common school education." See Ill.Rev.Stat. ch. 122, §§ 14–1 to 14–12 (in the form enacted by the School Code of 1961 and hence applicable to the years at issue in this case). In the wake of the federal Education for All Handicapped Children Act of 1975, 20 U.S.C. §§ 1411–1420 ("EAHCA"), Illinois stepped up its efforts to provide "a free appropriate public educational to all handicapped children" (EAHCA § 1412(3)) and sought to qualify for federal financial assistance (see Illinois Mem.Ex. E).

Local school districts, under the guidance of the Illinois Office of Education, are responsible for identifying children in need of special education (*id.*). Other state agencies may then participate in the treatment and education of the students, but the Office of Education is charged with overseeing the educational programs offered by the other agencies (Illinois Mem. 9; Ill.Rev. Stat. ch. 122, ¶ 14–8.01, part of the current version of the School Code).

During nearly the entire period relevant to this action, Illinois' Department of Children and Family Services ("DCFS") operated three residential schools for the education of handicapped children:[3]

1. the Illinois Braille and Sight Saving School (now renamed the Illinois School for the Visually Impaired);

2. the Illinois School for the Deaf; and

3. the Illinois Children's Hospital School (now called the Illinois Children's

movant (*Hermes v. Hein*, 742 F.2d 350, 353 (7th Cir.1984)) may sometimes create the potential for denying *both* motions. Fortunately that is not the case here, for factual inferences are really not called for.

3. Illinois Mem. 5 n. 2 explains another agency took the schools over in 1979, just before the end of the audit period at issue in this case.

School and Rehabilitation Center) for children with orthopedic handicaps.

Students at those schools were drawn from districts all over the state that did not offer comparable programs. Indeed, the lack of classes at the local level was a prerequisite for admission to at least the first two schools (Illinois Mem. 7).

Illinois has applied to HHS for reimbursement of funds expended between October 1, 1975 and March 31, 1980 on various programs covered by Title XX. Its claim included $9,104,702 for operation of the DCFS schools, comprising:

    1. $6,311,908 for educational programs and

    2. $2,792,804 for room and board expenses.

Initially an HHS regional administrator disallowed all the claimed expenses. On July 29, 1983 that decision became Secretary's when the HHS Grant Appeals Board ("Board") affirmed the disallowance (Illinois Mem.Ex. A).[4]

### Timeliness of This Action

Secretary first argues this action (brought January 15, 1985) is untimely because it was filed nearly 18 months after Board's decision. Although she concedes there is no directly applicable statute of limitations, she argues alternatively:

    1. Illinois' action is barred by the equitable doctrine of laches.

    2. This Court should (a) borrow a 60-day statute of limitations from other types of actions authorized under the Act and (b) apply that statute retroactively to bar Illinois' Complaint.

Neither alternative is tenable.

### 1. Laches

*Lingenfelter v. Keystone Consolidated Industries, Inc.*, 691 F.2d 339, 340 (7th Cir.1982) reaffirmed that a laches defense cannot succeed without a showing of both plaintiff's lack of diligence *and* prejudice to defendant:

Laches is principally a question of the inequity of permitting a claim to be en-

forced. It is unlike limitation, which is based merely on time. Rather, laches is based upon changes of conditions or relationships involved with the claim.

Only last week our Court of Appeals again confirmed that twofold aspect of a laches defense (*Jeffries v. CTA*, 770 F.2d 676, 679 (7th Cir.1985)):

Laches will bar this claim only if [plaintiff] had inexcusably delayed in asserting it and [defendant] has been materially prejudiced by the delay.

■ Secretary has simply failed to show any "changes of conditions" or other prejudice (material or otherwise) in *this* case. Instead her Mem. 23–28 conjures up the specter of the administrative havoc and uncertainty that could result if many *other* litigants delayed as long as Illinois has in seeking review of disallowances. Thus Secretary urges this Court to bar Illinois' claim strictly as a matter of policy and as a speculative means of deterring other litigants from following Illinois' example.

But an appeal to equitable relief must focus on the circumstances of *this* case, not another and purely hypothetical one. Effectively Secretary asks this Court, in the exercise of its equitable powers, to establish a rigid rule of law under which *any* petition for review of a disallowance, if filed 17 or more months after Board's decision, would be barred regardless of the individual circumstances of the case.

■ Such rigidity is antithetic to the very concept of equity. As *Black's Law Dictionary* 484 (5th ed. 1979) reflects (mirroring the origins of courts of equity), equity itself involves the rejection of rigid rules to accomplish what is fair and just in a particular situation. Absent a showing of material prejudice to Secretary (and none has been made), the equitable doctrine of laches is inapplicable to the circumstances of this case.

### 2. Retroactive Application of a Borrowed Statute

■ Secretary then argues at great length this Court should borrow and apply

---

**4.** Board also considered—but severed for fur-

ther development—a third issue (R. 294).

the 60-day statute of limitations applicable to many other Social Security Act claims, just as the Supreme Court has applied "borrowed" limitations periods in *Wilson v. Garcia*, —— U.S. ——, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985) and *DelCostello v. International Brotherhood of Teamsters*, 462 U.S. 151, 103 S.Ct. 2281, 76 L.Ed.2d 476 (1983). She asserts courts are the appropriate governmental arm to establish a limitations period for disallowance reviews, because jurisdiction to entertain such reviews in the first place has been implied by courts rather than expressly conferred by Congress. *State of Illinois, Department of Public Aid v. Schweiker*, 707 F.2d 273, 275, 277 (7th Cir.1983).

But even if it were assumed proper to apply a "borrowed" limitations period, and even if Secretary's proposal of a 60-day period were deemed appropriate to that end, that period should not be applied retroactively to bar Illinois' claim. *Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07, 92 S.Ct. 349, 355–56, 30 L.Ed.2d 296 (1971) teaches a decision may not be applied retroactively if each of two conditions obtains:

 1. That new decision resolves "an issue of first impression whose resolution was not clearly foreshadowed."

 2. Retroactive application would be inequitable under the circumstances of the case.

Those rules could not fit the current circumstances more precisely. Secretary concedes no court has ever applied *any* statute of limitations to claims seeking review of disallowance decisions, even though states have waited up to a year to file them. In fact Secretary R.Mem. 4 admits no court has even looked at the issue.

It is thus an understatement to say there has been no "foreshadowing" of a short limitations period. In the words of *Chevron*, 404 U.S. at 108, 92 S.Ct. at 356 (citation omitted):

It would also produce the most "substantial inequitable results" ... to hold that the respondent "slept on his rights" at a time when he could not have known the time limitation that the law imposed upon him.

Because a new limitations period could not properly be applied to Illinois' claim, and in light of this opinion's disposition on the merits, the issue whether any limitations period should be borrowed—and if so which period—need not be discussed further.[5]

### Disallowance of Educational Costs

■ Both parties agree the educational expenses claimed for DCFS schools would normally be reimbursed under Act § 1397a(a)(1), which during the relevant period authorized Title XX funding for a variety of services including:

services designed to meet the special needs of children ..., the blind, ... [and] the physically handicapped.

But Secretary disallowed the expenses under the then-applicable Act § 1397a(a)(10):

No payment may be made under this section with respect to any expenditure for the provision of any educational service which the State makes generally available to its residents without cost and without regard to their income.

Secretary's corresponding regulation during the years at issue provided (45 C.F.R. § 228.43[6]):

FFP [Federal Financial Participation] is not available for any educational service made generally available through any State or local educational agency to residents of the state without cost and without regard to their income. To the extent a fee is imposed on any resident, FFP is available only for such fee.

Where the litigants part company is over the meaning of "generally available." Board's and Secretary's contention is that free educational services were "generally

---

5. See the recent extended discussion by our Court of Appeals in *Smith v. City of Chicago*, 769 F.2d 408 (7th Cir.1985) announcing a prospective limitations period under circumstances

more compelling from the defendants' perspective than those urged by Secretary.

6. All further citations to 45 C.F.R. will simply take the form "Reg. § —."

available" to handicapped Illinois children without regard to income, because those services were provided to every such student through the combined network of local school district programs and DCFS schools. Stripped to its essentials,[7] Illinois' position is that programs were not "generally available" for purposes of Act § 1397a(a)(10) unless they were provided:

    1. both by and within local school districts and

    2. by educational agencies meeting those "by and within" criteria.

Under Illinois' reading, then, the services in dispute were not generally available in the state because many school districts referred their handicapped students out to the centrally-located and social-service-agency-operated DCFS schools. Illinois claims to support that notion with a number of opinions and guidelines published by HHS, but all of them actually confirm Secretary's contention (Administrative Record ["R."] 100–15).

Any analysis must of course begin with—and focus on—the language of Act § 1397a(a)(10) itself. "[A]ny educational service which the State makes generally available to its residents" is a sweeping phrase, one that by its literal terms includes services provided by *any* state agency *anywhere* in the state. Nothing in the statutory language even hints at the narrow reading Illinois advocates.

That means Illinois cannot force the statutory language into Illinois' own unnaturally narrow mold without (at a minimum[8]) convincing evidence from the legislative history and purpose or from Secretary's regulations. Illinois identifies no such evidence.

### 1. Legislative Purpose

When Congress passed Title XX it clearly intended to supplement, rather than to replace, state funding of social services. Act § 1397b required states receiving Title XX funds to continue funding social services at prior levels. Title XX was structured to allow states to extend their services further than before, and Act § 1397a reads like a congressional judgment that its supplemental resources were better spent on services in nonexistent or limited state supply than on services already generally available.

Illinois' skewed reading of Act § 1397a wholly ignores Congress' unwillingness to take over state funding of existing programs. According to Illinois, Congress would have been prepared to assume the bulk of the expenses of Illinois' programs even if Illinois were already providing, entirely at its own cost, comprehensive and free educational services to every single handicapped child in the state.

For that reason alone Illinois' proposed interpretation is highly suspect. But the most fundamental problem with Illinois' position is that it attributes to Congress a totally arbitrary and rather absurd distinction—based purely on form—among state programs. If Illinois were right, Congress' concern was not whether states provided services at all, but rather whether the services were provided within local school districts by educational agencies. In those terms Illinois might qualify for extensive federal funding, while a second state that provided *exactly* the same type and extent of services to handicapped children might not qualify for a single penny—and that would be so merely because its services

---

**7.** Illinois makes other arguments, but there is no need to consider them separately because they all stand or fall with Illinois' interpretation of the phrase "generally available." Board's decision discusses them adequately.

**8.** With such unambiguous statutory language, conventional wisdom would foreclose any recourse at all to legislative history (or administrative regulations, for that matter). But the "modern" school of statutory interpretation (sometimes jocularly phrased as "look at the

legislative history, and if it is ambiguous then look at the statutory language") has gained a disturbing amount of currency in the highest circles. Justice Stevens has been especially critical of that tendency by the Supreme Court. See, e.g., *Kosak v. United States,* 465 U.S. 848, 104 S.Ct. 1519, 1531, 79 L.Ed.2d 860 (Stevens, J., dissenting). If only out of an abundance of caution, this Court will go beyond what should by rights be dispositive: the statute itself.

were provided by and within local school districts.

Illinois offers no suggestion *why* Congress might have been so preoccupied with such formalities, nor has it produced a shred of evidence of such preoccupation from either the statute or its legislative history. Surely Congress would not have decided multi-million dollar block grants should hinge on such considerations without making *some* reference to them.[9] Total congressional silence on that score shouts down Illinois' attempted appeal to legislative history.[10]

### 2. Regulations and Opinions Promulgated by Secretary

At the outset a fundamental principle of administrative law must be recognized: Secretary cannot effectively "amend" a statute in such a basic respect by means of regulations. Glossing over (or more accurately, wholly ignoring) that proposition, Illinois cites:

1. language in Reg. § 228.43 prohibiting federal funding for services "generally available through any State or local *educational* agency" (emphasis added); and

2. the test, as stated in HHS' October 1, 1975 Title XX Program Regulation Guide ("PRG") (R. 100), for determining whether a service is "generally available."

Neither of those affords Illinois any comfort. In fact, those and other sources cited by Illinois rather confirm Secretary has consistently construed Act § 1397a in the same way she now urges.

9. Were the congressional focus as Illinois would have it, we might reasonably expect to find not merely some passing reference, but one or more entire statutory provisions, or substantial discussion in committee reports, directing or encouraging states to adopt the desired structural formalities.

10. Illinois makes a puzzling argument in this area, urging Secretary's position would result in no state ever being eligible for Title XX funds if it had its own law mandating free appropriate public education for all handicapped children.

### (a) Which Agency May Provide the Educational Service

Illinois interprets Reg. § 228.43 as restricting "general availability" analysis to educational agencies. But Secretary's comments when that regulation was promulgated make it plain the term "educational" was inserted not to modify (in the limiting sense) "state agency," but rather to embrace local school districts within the agencies included in "general availability" analysis. Thus "educational" was intended to serve an expansive purpose, not a restrictive one as Illinois urges (40 Fed.Reg. 27352, 27353 (1975)):

> Writers [to Secretary about the proposed regulation, among other expressions of views] recommended deletion of "local educational agency." Since many States provide education through and at the discretion of local agencies, inclusion of such agencies is necessary to carry out the intent of the law.

That regulatory construction, under which services rendered by *any* state agency were taken into account in determining general availability, is confirmed by the May 11, 1976 opinion memorandum of HEW[11] Regional Commissioner Virginia Smyth (appended to Illinois' Memorandum in the Board proceeding, R. 107). Ms. Smyth there stated Secretary's position a service was generally available under Reg. § 228.43 even if provided by a noneducational agency, provided the service conformed to the state Board of Education's requirements for education of the handicapped. And on that score Illinois Mem. 9–10 asserts the Illinois Office of Education's role with respect to the DCFS and other state agencies is that of:

> But that contention is clearly wrong. It must be remembered the statute speaks of services "generally available"—and the plain sense of that phrase is available *in fact*, not hypothetically via (for example) a non-implemented statutory provision. Thus the very documents Illinois produces to support its assertion show a state would qualify for federal funding if, despite its own law, it were unable *in fact* to provide such services to all handicapped children.

11. HHS is the governmental successor to HEW.

insuring that all programs and services provided to handicapped children operated by other state agencies are operated in accordance with appropriate procedural safeguards and standards jointly developed and agreed to by the Illinois Office of Education and the other state agency.

Finally, the PRG on which Illinois relies also states without qualification (R. 100) (emphasis added):

> Federal financial participation is available for educational services only if (1) the service is included in the services plan and (2) residents of the State may not usually receive the service free from *a public agency.*

### (b) Whether the Service Must Be Provided Within Each School District

Illinois' claim as to the meaning of the PRG regarding the location in which services must be provided also clutches at straws. PRG at 2438 (R. 101) provides:

> The three methods which a State may utilize in determining if a service is "generally available without cost and without regard to income" are as follows:
>
> 1. *Total Population Test*—an educational service is generally available if it is provided in school districts or other designated areas that have populations which total 75% or more of the total population of the area being tested (geographic area or entire State).
> 2. *Target Population Test*—an educational service is generally available if it is provided in school districts or other designated areas to 75% or more of the target population for whom the service is intended in the

area being tested (geographic area or entire State).

> 3. *School District Test Without Regard to Population*—an educational service is generally available if it is provided in 75% or more of the school districts in the area being tested (geographic area or entire State).

Illinois seeks to interpret the phrase "in school districts" as a requirement that services be provided *within* the boundaries of each district. But that reading utterly ignores the import of the adjacent phrases:

1. "or other designated areas"; and
2. "(geographic area or entire state)."

It is clear "school districts" are referred to merely as convenient geographical boundaries for defining the *populations* whose access to services is to be the measure of general availability. By its own terms the PRG test can be applied equally well to populations of larger or smaller geographical areas bearing no relation to school districts. In fact the parenthetical phrase "or entire State" suggests the test may be applied to the state as a whole without regard to smaller boundaries. Thus the PRG actually produces inferences contrary to Illinois' position.

In sum, every legitimate approach to the meaning of language points to the same conclusion. Board (and hence Secretary) correctly determined Illinois was not eligible for reimbursement of educational costs at DCFS schools.[12]

### Room and Board Costs

■ During the relevant period Act § 1397a(a)(7)(E) barred the use of federal funds to reimburse states:

> 1. Nothing in the legislation or its history sandbagged Illinois into adopting or expanding its programs on any legitimate misunderstanding it could get federal reimbursement.
> 2. Secretary's position (even if it could somehow change Congress' decision, as it could not) was consistent and did not improperly "surprise" Illinois.

---

**12.** Illinois began its substantive discussion (Mem. 10–13) by invoking *Pennhurst State School v. Halderman,* 451 U.S. 1, 17, 25, 101 S.Ct. 1531, 1539, 1544, 67 L.Ed.2d 694 (1981), on the theory Secretary has engaged in an impermissible retroactive changing of the ground rules—somehow trapping Illinois into participating in federal grant programs on a false premise as to the bargain involved. As this opinion has reflected, that argument is doubly flawed:

for the provision of room or board ... other than room or board provided for a period of not more than six consecutive months as an integral but subordinate part of a service described in paragraph (1) of this section.

Secretary originally implemented that provision in a regulation allowing payment for room and board only (Reg. § 228.41(a) (1976)):

when provided to an individual who is receiving a service of which room or board is an integral but subordinate part and then only for a period of not more than six consecutive months in any 12-month period and for not more than one 6-month period for any one episode or placement.

Later the same regulation was amended to allow payment only (*id.* (1978)):

as an integral but subordinate part of another service and then only for a period of not more than six consecutive months for any one placement.

Finally, Reg. § 228.41(d) (1978) in turn defined placement as:

an uninterrupted period of time during which an individual takes up, or is placed in, residence in a facility other than his usual place of residence, for the purpose of undergoing a specific regimen of services or treatment according to a prescribed plan.

DCFS schools had a high ratio of returning students. For example, 81% of the students enrolled during the 1977–78 school year returned in 1978–79. That factor leads the litigants to dramatically different results on the room-and-board issue.

Illinois treated each school year as a separate "placement," claiming room and board expenses for each student each year. Conversely, Secretary disallowed $2,792,-804 of the claimed expenses on the ground that a child's year-after-year enrollment was a single "placement," entitling Illinois to reimbursement for only one six-month period per child, no matter how many years the child was enrolled (except in the unusual case where there were two wholly separated enrollments). Secretary viewed the summer months as a vacation rather than a break in the placement.

Illinois bases its view of each year as a separate placement on the individualized nature of treatment at the schools. As Board found, a very detailed individualized education program ("IEP") is prepared for each student (R. 289). That IEP contains a comprehensive list of goals the child is expected to achieve during a semester, and (*id.*):

[E]ach facility utilizes a variety of tools to supplement the child's I.E.P. The Illinois School for the Deaf (ISD) employees [use] aptitude testing to identify individual needs and achievements. Children are grouped on the class list according to individual ability. A child may change classes, or programs, one or more times during a school year if it is determined that a change would improve learning and emotional development. Children are also rated on psychological factors including social adequacy and communication skills. Parent involvement is sought on a regular basis. Report cards and progress reports are sent to all parents at the end of each nine week term. Parents receive an end-of-year report which aids in determining whether another placement is needed. Parent conferences are scheduled throughout the year to obtain input regarding placement, goals, objectives, and curriculum (Tab 11). A recommendation on each child is submitted to the superintendent at the end of the school year when the treatment plan is concluded.

Based on those carefully plotted treatment programs, Illinois says each separate year of schooling is a "specific regimen of services or treatment according to a prescribed plan" (Reg. § 228.41(d)). Because each year's plan is different, it assertedly amounts to a new course of treatment. And Illinois stresses the parents and the State never determine in advance how many years a child will remain in a special school. Instead such decisions are made on a year-by-year basis, only after a child's

progress has been analyzed and discussed among parents and school officials.

Board gave careful consideration to Illinois' extensive evidence. It then rejected the State's factual argument, finding a significant continuity in treatment from year to year (R. 289):

We find that the foregoing, and the documents, evidence much of a continuing, cyclical, arguably even routine, nature. The process appears to be a laudable one, but it nevertheless is much more akin to an on-going evaluation/training process than to anything like the time-constrained exceptional effort for which section 2002(a)(7)(E) allows collateral payment. IDPA cannot change this merely by such superficial things as labeling IEPs "treatment plans." The IEPs bear a strong resemblence (sic) to periodic education plans one may observe in use in any typical public education program. Furthermore, the IEPs themselves contain a number of statements strongly implying that there is an on-going continuity of process; the Agency quoted these provisions at length in its brief (*see* pp. 15–16) and we will not repeat them here. IDPA did not explain these provisions in its reply.

Board's interpretation of "placement" began with the premise that because room and board expenses are not generally reimbursed under Title XX, the exception in Act § 1397a(a)(7)(E) (and the regulations promulgated thereunder) should be narrowly construed (R. 286). Board found further support for a narrow construction in HHS's 1980 Guide to Federal Financial Participation Under Title XX of the Social Security Act (the "Guide") 3.D.13 (Illinois Ex. J): [13]

If one placement ends and another placement begins for the same service or the same type of service, FFP is available for the cost of room or board during a second placement only if the individual was discharged from the prior placement because further treatment was not needed, not feasible, or not available and not for purposes of reentering the facility in order to begin another 6-month period of room or board. A new placement would begin, for example, if a person successfully completes a course of treatment, is discharged, or manages well in the community for a period of time until he or she has a relapse which necessitates a second placement.

It is clear the DCFS students did not meet the criteria of the Guide.[14] It distorts the Guide's language to say of students home for summer vacation that "further treatment was not needed, not feasible, or not available." Those same students returned to school in the fall, not because of relapses, but rather because parents, guardians, and school officials had determined at the end of the school year further treatment was necessary.

As the Guide makes plain, a break in service of a few months does not necessar-

**13.** There has been some procedural wrangling by the parties over the matters this Court may consider in what is essentially the review of an administrative decision (and as to which this Court should therefore be limited by the administrative record). Those disputes have not affected this decision. For example, the 1980 Guide was not of course in force (or existence) during the audit period at issue in this case. However, the Regulation did not change between 1978 and 1980, and there is no indication Secretary's interpretation of it changed during that period. Moreover, Illinois offered the Guide both before Board and in this Court as evidence favoring its interpretation. Though Secretary has not objected to this Court's consideration of the 1980 Guide (and she has suggested this Court could consider the 1975 Guide as a matter of judicial notice, Secretary Mem. 11–12

n. 4), she has moved to exclude other exhibits now tendered by Illinois that were not part of the administrative record. Because this Court has reviewed the challenged exhibits and determined they would not change the decision on the merits, resolution of that issue is unnecessary.

**14.** Illinois relies heavily on the opinion of an HHS auditor that Illinois did in fact meet the Guide's criteria. But such an auditor is a lower-echelon employee with no decisionmaking authority. Familiar principles render his opinion non-binding against the federal government. *Schweiker v. Hansen,* 450 U.S. 785, 788–91, 101 S.Ct. 1468, 1470–72, 67 L.Ed.2d 685 (1981). Indeed, under the circumstances the auditor's view can carry no real weight here.

ily bring a placement to a close. And the hallmarks set forth in the Guide for the end of a placement correspond more to a graduation than to the mere completion of a particular grade (Guide 3.D.9 and 3.D.10):

> A placement that is ending is typically marked by indications that the recipient has successfully completed the prescribed course of treatment or services, or that an evaluation of the individual shows that he or she is now able to function outside the facility, or that the person is discharged without the intention of reentering the service facility (or a similar type of service facility) for further treatment.

Promulgated in 1980, the Guide interprets the language of the 1978 regulation as to "placements." Illinois contended before Board (though it did not repeat the argument here) the reference in the 1976 regulation to "placement or episode" is more expansive and accommodates Illinois' position. But Board found no basis in the regulation itself to construe it differently from the newer regulation (R. 290), and Illinois apparently did not submit a pre-1978 Guide to flesh out the earlier regulation. In that respect it is worth noting the 1975 Guide would have supported *Board's* interpretation had Illinois attempted to rely on it (see Secretary Mem.App. 1, at 2418).

*Bedford Medical Center v. Heckler,* 766 F.2d 321, 323 (7th Cir.1985) commands a deferential standard of review of the Board's decision, particularly in interpreting regulations (citations omitted):

> Our standard of review of this reimbursement decision has been established by the Administrative Procedure Act. 5 U.S.C. § 706 (1982). When reviewing administrative decisions, federal courts are authorized to set aside agency decisions only when they: are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law; are contrary to constitutional right, power, privilege, or immunity; exceed statutory jurisdiction or fall short of statutory right; are reached in violation of established procedure; or are unsupported by substantial evidence.... We note also that the interpretations of regulations issued pursuant to a statute, especially a statute as complex as the Medicare Act, are entitled to considerable deference.

Board's decision as to the room and board expenses was thorough, well-reasoned and well supported by the evidence. *Bedford* and the reasonableness of Board's decision compel this Court to affirm Board.

### Conclusion

There is no genuine issue of fact, and Secretary is entitled to a judgment as a matter of law. Because that conclusion compels the granting of Secretary's motion for summary judgment (and of course the denial of Illinois' motion), this action is dismissed with prejudice.