**RAYMOND PROFFITT FOUNDATION; Lehigh River Stocking Assn., Appellants**

v.

**U.S. ARMY CORPS OF ENGINEERS; Debra M. Lewis, Lt. Col., District Commander.**

**No. 02–3565.**

United States Court of Appeals, Third Circuit.

Argued July 9, 2003.

Filed Sept. 3, 2003.

John Wilmer (argued), Media, PA, for Appellants.

Karen L. Tomlinson, Office of United States Attorney, Philadelphia, PA, Anna T. Katselas (argued), Silvia Sepulveda–Ham-bor, United States Department of Justice, Environment & Natural Resources Division, Washington, DC, for Appellees.

Before NYGAARD, SMITH, Circuit Judges, and IRENAS, District Judge.*

## OPINION OF THE COURT

SMITH, Circuit Judge.

The Raymond Proffitt Foundation and the Lehigh River Stocking Association (collectively, the "Foundation") appeal from an order of the Eastern District of Pennsylvania granting summary judgment to the U.S. Army Corps of Engineers ("Corps"). The District Court concluded that the Water Resources Development Act of 1990 ("WRDA"), the statute the Foundation asserts the Corps is violating, provides no "law to apply" to the facts this case presents and that the Corps' actions are therefore not subject to judicial review under the Administrative Procedures Act, 5 U.S.C. § 500 *et seq.* ("APA"). Although we disagree with that specific holding of the District Court, the broad deference that Congress granted the Corps in executing the environmental mission of the WRDA places upon us the obligation to provide a correspondingly deferential judicial review. Granting the Corps that deference, we conclude that the Foundation has failed to demonstrate that the Corps has unlawfully delayed or withheld agency action or otherwise been arbitrary, capricious, or in violation of law. We will affirm the District Court's grant of summary judgment.

## I.

The Raymond Proffitt Foundation and the Lehigh River Stocking Association are

---

* Honorable Joseph E. Irenas, Senior United States District Judge for the District of New Jersey, sitting by designation.

organizations whose members fish, hunt, boat, raft, and otherwise recreate in and along the Lehigh River downstream of the Francis E. Walter Dam ("Walter Dam") in Northeastern Pennsylvania. The Walter Dam is operated by the Philadelphia District of the Corps as part of the Lehigh River Basin Flood Control Project. Completed in 1961, Congress originally authorized construction of the Walter Dam primarily for flood control, but later expanded the mission of the Walter Dam in 1988, requiring it to be "operated in such a manner as will protect and enhance recreation." Water Resources Development Act of 1988, Pub. L. No. 100–676, § 6, 102 Stat. 4012 (1988). Congress subsequently enacted the Water Resources Development Act of 1990. Section 306 of this Act required the inclusion of "environmental protection as one of the primary missions of the Corps of Engineers in ... operating, and maintaining water resources projects." WRDA of 1990 § 306, 33 U.S.C. § 2316 (1994).

In 1994, the Corps issued a "Revised Manual" presenting a plan of regulation for the Walter Dam. In this manual, the Corps noted that "[t]his dam, along with Beltzville Lake Dam and Reservoir (Corps of Engineers project) are the only major reservoirs in the Lehigh River watershed intended to serve flood control purposes." The Corps stated that the "primary objective of the F.E. Walter Reservoir Project is flood control. Other objectives are lake and downstream recreation (whitewater) and drought emergency water supply/water quality storage."

In establishing the water control plan for the Walter Dam, the Corps stated that:

Releases made to meet minimum release criteria will be sufficient to maintain and enhance downstream fisheries. Criteria has [*sic*] been developed to avoid abrupt gate raising and closing changes during above normal releases for flood control regulations. Efforts will be made to make releases so as to minimize adverse shock effects on downstream fisheries.

Nonetheless, the Corps believed "[w]ater control management needs must take precedence over fishery accommodation but the attempt should be made to adjust procedures for fishery purposes whenever possible." Assessing the overall effect of the water control plan, the Corps concluded the "Francis E. Walter Reservoir provides good habitat for fisheries. The reservoir, and the Lehigh River (below the dam), are listed as High Quality–Cold Water Fisheries in Pennsylvania (Chapter 93 Water Quality Standards)."

In August of 1999, the Foundation filed a twelve count complaint against the Corps and its Philadelphia District's Commander in the District Court. Jurisdiction was appropriate pursuant to 28 U.S.C. § 1331. Count one of the complaint, brought pursuant to the Administrative Procedures Act, 5 U.S.C. § 706, asserted that the Corps was unlawfully withholding or delaying agency action required by § 306 of the WRDA and otherwise not acting in accordance with the WRDA. The Foundation alleged that these violations stemmed from two actions or inactions on the part of the Corps. First, the Foundation asserted the Corps failed to include "environmental protection" as one of the "missions" for the Walter Dam in the drafting of the 1994 Manual. Supp. App. 8 (Pls.' Compl. ¶¶ 50–52). Second, the Foundation claimed:

[t]he Corps is not fulfilling, or even attempting to fulfill its mission of environmental protection because it a) releases large amounts of water during high flow periods, usually in winter and spring; and b) fails to store water during these high flow periods and release that water

during low flow periods, usually summer.

*Id.* (Pls.' Compl. ¶ 53).

Presently, the Corps' basic operational rule for the Walter Dam is that during normal conditions the Corps will match the dam's outflow to its inflow. Thus, the Corps generally keeps the amount of water in the Walter Dam's reservoir at a constant elevation of 1300 feet, thereby attempting to replicate in the lower Lehigh River below the dam the flow that would be naturally present if the Walter Dam had not been constructed above. During the wetter winter and spring months, more water enters the reservoir from rainfall and melting snow. The Corps therefore releases more water from the dam, resulting in a higher water flow and river level below. During drier summer months, as less water falls and drains into the reservoir, the Corps releases less water from the reservoir. This results in a correspondingly lower flow and river level below.[1]

The Foundation believes that, so as to "provide a better environment for aquatic species, provide recreation for fisherman [*sic*], canoeists, and provide whitewater rafting throughout the summer," the Corps is "required" by the WRDA to improve upon the naturally occurring environment by augmenting the lower Lehigh River's flows in the summer. The Foundation therefore sought declaratory and injunctive relief mandating the Corps to change its policy and operations at the Walter Dam to reflect the judgments of the Foundation regarding the proper operation of the dam. The Corps responded to this first claim by asserting that § 306 of WRDA is a mission statement which is fundamentally discretionary in nature, committed to the agency by law, and unreviewable through the APA.

The District Court granted summary judgment to the Corps on all of the Foundation's claims, holding with respect to count one that the Corps' actions under the WRDA were unreviewable because the WRDA did not provide any "law to apply" to this situation. *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 175 F.Supp.2d 755, 767 (E.D.Pa.2001).[2] The District Court reasoned that the WRDA's "environmental protection mission was placed upon the Corps as a whole, not upon each individual water resources project. The Corps has the discretion to apply this statutory mission to water resources projects that it operates, but is not obligated to implement it at any particular one." *Id.* at 767. "The text of § 2316 provides only a general statement that establishes environmental protection as one of the Corps' primary missions. However, this language gives no guidance on how this mission is to be carried out." *Id.* at 766. Therefore, the District Court reasoned that this statute fit within the excep-

---

**1.** The Corps' policy is not to fully replicate in the river below the same flow that would result if the dam had never been built. Obviously, as a flood control project, the outflows from the Walter Dam reservoir will be constrained when necessary to prevent downstream flooding. Furthermore, in accordance with the project's secondary recreational purpose, the Corps' policy is to raise the reservoir's level 0.7%, five times a year, to facilitate whitewater rafting events on the river below. The Foundation does not assert that either of these practices are unlawful.

**2.** The District Court also granted summary judgment on the Foundation's other eleven claims. Worth noting is that the District Court dismissed the claims that the Corps was violating the federal Clean Water Act ("CWA") and the National Environmental Policy Act ("NEPA") at the Walter Dam. As noted *infra*, the Foundation did not appeal from the dismissal of those claims.

tion from reviewability applied by the Supreme Court in *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

The Foundation appealed only from the District Court's judgment on count one that "[t]he mission statement of § 2316 is insufficient to provide law to apply in this case" and that the Foundation can, therefore, assert no violation of the WRDA through the APA. 175 F.Supp.2d at 767. Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1291. "Our scope of review of the district court's decision on" whether "judicial review was ... available pursuant to 5 U.S.C. § 701(a)(2)" and whether the agency action was not "in accordance with law ... is plenary." *See Davis Enters. v. U.S. E.P.A.*, 877 F.2d 1181, 1184 (3d Cir.1989). However, where Congress has granted discretion to an agency to make decisions, "[w]e are only free to determine whether the agency followed its own guidelines or committed a clear error of judgment." *Id.* at 1186 (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). "While we may not have made the same decision as the [agency], we are not free to substitute our judgment for that of the agency on [an] issue." *Id.*

## II.

Section 306 of the WRDA states: "The Secretary [of the Army] shall include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." 33 U.S.C. § 2316(a).[3] In the event that an administrative agency covered by the strictures of the APA violates a stat-

ute, the APA provides that a "person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Both "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review." 5 U.S.C. § 704. In such an instance, the "reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; ..." § 706. However, "[t]his chapter" does not "apply ... to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." § 701(a). The Corps does not contend that the WRDA facially precludes judicial review. Rather, the Corps contends that the agency actions with which the Foundation is concerned are impliedly "committed to agency discretion by law." § 701(a)(2).

### A.

"The APA's 'generous review provisions must be given a "hospitable" interpretation.' " *Hondros v. U.S. Civil Service Comm'n*, 720 F.2d 278, 293 (3d Cir.1983) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). "[O]nly upon a showing of 'clear and convincing evidence' of a contrary legislative intent should the courts restrict access to judicial review." *Abbott Labs.*, 387 U.S. at 141, 87 S.Ct. 1507 (quoting *Rusk v. Cort*, 369 U.S. 367, 379, 82 S.Ct.

---

**3.** Nonetheless, the WRDA provides that "[n]othing in this section affects—(1) existing Corps of Engineers' authorities, including its

authorities with respect to navigation and flood control ..." 33 U.S.C. § 2316(b).

787, 7 L.Ed.2d 809 (1962)). "In *Citizens to Preserve Overton Park, Inc. v. Volpe,* . . . the Supreme Court interpreted section 701(a)(2) as establishing a broad presumption in favor of reviewability, holding that the exception applied only when there is no law to apply." *Davis Enters.,* 877 F.2d at 1184–85. In *Heckler v. Chaney,* 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), the Supreme Court first found occasion to apply this exception.

*Heckler* considered whether "a decision of an administrative agency to exercise its 'discretion' not to undertake certain enforcement actions is subject to judicial review under the Administrative Procedure Act, 5 U.S.C. § 501 *et seq.* (APA)." *Id.* at 823, 105 S.Ct. 1649. The petitioners were prison inmates sentenced to death by lethal injection who asserted that the use of those "drugs for capital punishment violated the Federal Food, Drug, and Cosmetic Act . . . and request[ed] that the FDA take various enforcement actions to prevent these violations." *Id.*

Nothing that "[t]he Act's general provision for enforcement, 372, provides only that '[t]he Secretary is *authorized* to conduct examinations and investigations . . .' (emphasis added)," *id.* at 835, 105 S.Ct. 1649 (emphasis in original), the Supreme Court reasoned the "Act's enforcement provisions thus commit complete discretion to the Secretary to decide how and when they should be exercised." *Id.* The Court emphasized that the "general exception to reviewability provided by § 701(a)(2) for action 'committed to agency discretion' remains a narrow one, *see Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), but within that exception are included agency refusals to institute investigative or enforcement proceedings, unless Congress has indicated otherwise." *Id.* at 838, 105 S.Ct. 1649.

Since *Heckler,* the Supreme Court has extended its holding to other contexts, concluding that other agency decisions were "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). In *Webster v. Doe,* 486 U.S. 592, 108 S.Ct. 2047, 100 L.Ed.2d 632 (1988), an employee contested his dismissal by the CIA's Director pursuant to § 102 of the National Security Act. That Act provided that the "'Director of Central Intelligence may, in his discretion, terminate the employment of any officer or employee of the Agency whenever he shall deem such termination necessary or advisable in the interests of the United States....'" *Id.* at 594, 108 S.Ct. 2047 (quoting 50 U.S.C. § 403(c) (current version at 50 U.S.C. § 403–4(h))). The Court found "that the language and structure of § 102(c) indicate that Congress meant to commit individual employee discharges to the Director's discretion, and that § 701(a)(2) accordingly precludes judicial review of these decisions under the APA." *Id.* at 601, 108 S.Ct. 2047.

The petitioners in *I.C.C. v. Brotherhood of Locomotive Engineers,* 482 U.S. 270, 107 S.Ct. 2360, 96 L.Ed.2d 222 (1987) sought to appeal the Interstate Commerce Commission's denial of reconsideration of an earlier administrative decision solely on what the petitioners asserted had been a "material error." The statute provided that the "'Commission may . . . because of material error, new evidence, or substantially changed circumstances . . . (B) grant rehearing.'" *Id.* at 277–78, 107 S.Ct. 2360 (quoting 49 U.S.C. § 10327(g) (current version at 49 U.S.C. § 722(c))). The Court reasoned that because there was no "new evidence" or "changed circumstances" alleged to the I.C.C. after it issued the original order,

an appeal [of the order denying reconsideration *vis-a-vis* an appeal from the original order] places before the courts

precisely the same substance that could have been brought there by appeal from the original order–but asks them to review it on the strange, one-step-removed basis of whether the agency decision is not only unlawful, but *so* unlawful that the refusal to reconsider it is an abuse of discretion.

*Id.* at 278–79, 107 S.Ct. 2360. The Supreme Court reasoned that the appeal was, or would become, a mechanism for evading the statute of limitations applicable to a challenge of the original order and decided that the reconsideration denial was therefore "unreviewable" unless one of the two other bases for reconsideration are asserted. *Id.* at 279–80, 107 S.Ct. 2360. Later, the Supreme Court also held that the "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Lincoln v. Vigil,* 508 U.S. 182, 192, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993).

To date, the Supreme Court has only applied the *Heckler* exception on an *ad hoc* basis. Nonetheless, this Court has

> set forth [an] analytical framework to be followed before the court may determine that an agency decision is unreviewable under section 701(a)(2). To so hold, we must consider whether: 1) the action involves broad discretion, not just the limited discretion inherent in every agency action; 2) the action is the product of political, military, economic, or managerial choices that are not readily subject to judicial review; and 3) the action does not involve charges that the agency lacked jurisdiction, that the decision was motivated by impermissible influences such as bribery or fraud, or that the decision violates a constitutional, statutory, or regulatory command.

*Davis Enters.,* 877 F.2d at 1185 (citing *Local 2855, AFGE (AFL–CIO) v. United States,* 602 F.2d 574 (3d Cir.1979)) (citations omitted). In *Local 2855,* when we first articulated this framework and applied it to hold an agency action unreviewable, a union challenged the Army's decision to contract out certain services to a private contractor. "[O]bserv[ing] that the statute is, for the most part, 'written in language of permission and discretion,'" the panel reasoned that "on the face of the statute there is simply 'no law to apply' in determining if [the] decision is correct." *Local 2855,* 602 F.2d at 581 (quoting *Southern Ry. Co. v. Seaboard Allied Milling Corp.,* 442 U.S. 444, 455, 99 S.Ct. 2388, 60 L.Ed.2d 1017 (1979); *Overton Park,* 401 U.S. at 410, 91 S.Ct. 814).

■ Applying the foregoing principles, the District Court erred in concluding that the WRDA falls within the APA's exception from reviewability contained in § 701(a)(2) because the WRDA does not contain "law to apply." *Proffitt Found.,* 175 F.Supp.2d at 767. There can be no doubt that the text of § 306 grants the Corps very broad discretion. However, "[b]road discretionary powers" are merely "[a] predicate to nonreviewability." *Local 2855,* 602 F.2d at 578. The "committed to agency discretion exception to judicial review is intended to be 'applicable in those rare instances where statutes are drawn in such broad terms that in a given case there is *no* law to apply.'" *Id.* at 578–79 (quoting *Overton Park,* 401 U.S. at 410, 91 S.Ct. 814 (internal citation omitted)) (emphasis added). In count one, the Foundation alleges two separate actions by the Corps which purportedly violate the WRDA. We consider, in turn, whether each of these agency actions are subject to judicial review.

**B.**

The Foundation first alleges that the Corps failed to take action to include "en-

vironmental protection" as one of the "missions" for the Corps both overall and specifically at the Walter Dam. The statute at issue certainly provides law against which we can consider those allegations. While it appears that the broad language of the WRDA means that few actions the Corps takes with respect to any particular water resources project will violate the APA, the WRDA clearly imposes an affirmative obligation to "include environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." 33 U.S.C. § 2316(a).[4] The one common thread running through the Supreme Court and Third Circuit precedents in this area is that where an agency's assertion that a decision "committed to agency discretion by law" has been upheld, "*on the face of the statute* there is simply 'no law to apply' in determining if [a] decision is correct." *Local 2855*, 602 F.2d at 581 (emphasis added). *See, e.g., Heckler*, 470 U.S. at 835, 105 S.Ct. 1649 (" '[t]he Secretary is *authorized* to conduct examinations and investigations ...' (emphasis added)") (emphasis in original); *Webster*, 486 U.S. at 594, 108 S.Ct. 2047 (the " 'Director of Central Intelligence may, *in his discretion,* terminate the employment ... *whenever* he shall deem such termination necessary ...' ") (emphasis added); *Locomotive Eng'rs*, 482 U.S. at 277–78, 107 S.Ct. 2360 (the " 'Commission *may* ... grant rehearing' ") (emphasis added); *cf. Lincoln*, 508 U.S. at 185, 113 S.Ct. 2024 ("the Snyder Act *authorizes*

the Service to 'expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,' " through "lump-sum appropriations"); *Local 2855*, 602 F.2d at 581 ("we observe that the statute is, for the most part, 'written in language of permission and discretion.' "). Nonetheless, that is not dispositive. Where a statute itself has been permissive or discretionary as to the agency, this Court has even read an agency's self-imposed practices or regulations into the statute so as to provide a basis for review. *See, e.g., Hondros v. U.S. Civil Service Comm'n*, 720 F.2d 278, 294 (3d Cir.1983) (the "Service has a regularized method for evaluating its employees" against which the employee's service could be compared); *Davis Enterps.*, 877 F.2d at 1185 (the "agency regulations or internal policies provide sufficient guidance to make possible federal review under an abuse of discretion standard ... even absent express statutory limits on agency discretion.").

In contrast, the statute at issue here states that the "Secretary *shall include* environmental protection as one of the primary missions of the Corps of Engineers in planning, designing, constructing, operating, and maintaining water resources projects." 33 U.S.C. § 2316(a) (emphasis added). Unlike other statutes where courts have found decisions committed to agency discretion by law, this statute is not "written in language of permission and discretion." *See Local 2855*, 602 F.2d at 581.[5] The statute requires the consider-

---

**4.** We note that, in actuality, the text of § 306 does not facially impose any duty on the Corps of Engineers. *See* 33 U.S.C. § 2316(a) ("The Secretary [of the Army] shall include ..."); *see also* 33 U.S.C. § 2201 (defining the "Secretary"). The Secretary of the Army was not made a defendant in this suit. Nonetheless, the parties, as well as the District Court, all appear to have assumed that § 306 also

imposes a direct duty on the Corps of Engineers, disputing only whether the execution of that duty is "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Therefore, we assume, without deciding, that § 306 applies equally to the Corps.

**5.** Neither the Corps nor the Foundation cite to a case where a "shall" statute such as the

ation of environmental protection when "operating, and maintaining water resources projects." *See* § 2316(a). The Corps admits as much in its brief, stating that the "sole 'command' identified by Proffitt under this criterion is Section 306 itself." Corps Br. at 26. Certainly, how the Corps implements this environmental protection mission appears to be left to the vast discretion of the Corps. There is, however, no discretion granted to the Corps on the issue of whether or not they are supposed to include environmental protection as a mission. They are.

Section 306 also fails the specific analytical test this Court established in *Local 2855*, and reaffirmed post-*Heckler* in *Davis Enterprises,* for determining whether a given decision is committed to agency discretion by law. While the Corps' actions under the WRDA appear to meet two of that test's three factors, they completely fail the last. "[T]he action [by the Foundation] *does* ... involve charges that the agency ... decision violates a constitutional, *statutory,* or regulatory command." *See* 877 F.2d at 1185 (emphasis added).

In sum, the District Court erred in concluding that the WRDA provides no "law to apply" to the Foundation's first allegation that the Corps failed to include environmental protection as one its overall missions and as one of the specific missions of the Walter Dam. *Raymond Proffitt Found.,* 175 F.Supp.2d at 767. There is law to apply. As the Corps itself effectively conceded at oral argument, where the Corps has "completely abdicated its environmental protection responsibilities," then "this statute, broad as it is, provides law to apply." Because the Foundation's complaint makes such allegations, we are free to review the Corps' actions to determine its compliance with § 306.

WRDA has been held to grant unreviewable

## C.

In addition to its allegations that the Corps is not including environmental protection as part of its "missions," the Foundation asserts that, by its actions in the actual operation of the Walter Dam, the "Corps is not fulfilling, or even attempting to fulfill its mission of environmental protection." Nonetheless, just because the Foundation's first allegation of unlawful agency action under § 306 is amenable to judicial review, it does not necessarily follow that all of its allegations pursuant to that statute are subject to judicial review. In *Lincoln v. Vigil,* 508 U.S. 182, 191, 113 S.Ct. 2024, 124 L.Ed.2d 101 (1993), the Supreme Court established that while agency action pursuant to a general Congressional authorization may be amenable to judicial review in a broad sense, certain specific "categories of administrative decisions that courts traditionally have regarded as 'committed to agency discretion'" may not be reviewable within the context of that broader mandate. *Lincoln* addressed a challenge by an Indian tribe to certain specific expenditures of the Indian Health Service within the context of a lump-sum appropriation from Congress. That appropriation "authorize[d] the Service to 'expend such moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,' for the 'relief of distress and conservation of health.'" *Id.* at 185, 113 S.Ct. 2024 (quoting 25 U.S.C. § 13).

■ Generally, an aggrieved party can bring an action to challenge an agency's expenditures as inconsistent with the "permissible statutory objectives" for which Congress appropriated the funds. *See id.* at 193, 113 S.Ct. 2024; *see also Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct.

discretion to an agency.

1055, 39 L.Ed.2d 270 (1974) (considering whether the Bureau of Indian Affair's implementation of its general assistance program was consistent with Congressional intent in appropriating the program funds).[6] Nonetheless, *Lincoln* stands for the principle that once that initial level of judicial review is passed, the specific execution by the agency to meet those objectives may still be left entirely within its discretion. The *Lincoln* Court held that the APA precluded judicial review of the specific allegations of those plaintiffs, reasoning that the "allocation of funds from a lump-sum appropriation is another administrative decision traditionally regarded as committed to agency discretion. After all, the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192, 113 S.Ct. 2024. "[A]s long as the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude. '[T]o [that] extent,' the decision to allocate funds 'is committed to agency discretion by law.'" *Id.* at 193 (quoting 5 U.S.C. § 701(a)(2)).

As part of its allegations that the specific operational policies of the Corps violate § 306, the Foundation apparently reads § 306 to prohibit the Corps from implementing at each and every water resources project under its administration any policies "causing harm to the aquatic life." Foundation Br. at 9. However, the WRDA states only that the "Secretary shall *include* environmental protection as one of the primary *missions* of the Corps ... [at]

water resources projects." 33 U.S.C. § 2316(a) (emphasis added). Congress did not clearly instruct the agency to "implement" that mission at any specific water resources project, let alone suggest how it should do so. Because § 306 provides "no objective standards" that "dictate how the Agency must implement this mission or how it must balance [environmental protection] with its other responsibilities," the Corps argues that § 306 "properly committed to the Corps' discretion" any judgments regarding the implementation of that mission.

■ We need not conclusively decide the proper interpretation of § 306 to determine whether the exception to review contained in APA § 701(a)(2) applies to these allegations. Before us now are not the merits of the Foundation's allegations, but whether judicial review of these specific actions is precluded because "on the face of the statute there is simply 'no law to apply.'" *Local 2855*, 602 F.2d at 581. Courts cannot preclude judicial review simply because a party appears likely to lose on the merits. That would put the cart before the horse. Rather, in determining whether judicial review is available in the first instance, we look for "'clear and convincing evidence' of a contrary legislative intent" before we will "restrict access to judicial review." *Abbott Labs.*, 387 U.S. at 141, 87 S.Ct. 1507 (quoting *Rusk v. Cort*, 369 U.S. 367, 379–80, 82 S.Ct. 787, 7 L.Ed.2d 809 (1962)). We will now consider § 306 only that far.

Compared to some of the more affirmative instructions Congress has given the Secretary and the Corps in later sections of the WRDA,[7] Congress' use of the

---

6. This assumes, of course, that a plaintiff meets all jurisdictional and administrative prerequisites for bringing such a claim.

7. *See, e.g.,* WRDA of 1990 § 307(b), 33 U.S.C. § 2317(b) ("The project under this subsection shall be carried out to improve the quality of effluent discharged from publicly owned

phrase "include ... as one of the primary missions" in § 306 if that phrase really is to mean "implement to the fullest at every" water resources project, as the Foundation suggests, strikes us as peculiar. *See Whitman v. Am. Trucking Assoc.*, 531 U.S. 457, 466, 121 S.Ct. 903, 149 L.Ed.2d 1 (2001) ("Words ... are given content, however, by their surroundings"). It would seem more than peculiar, however, to suggest that the Corps can simply develop a generic environmental mission statement and proceed to completely ignore it at every water resources project it administers. *But see Nat'l Treasury Employees Union v. Horner*, 854 F.2d 490, 495 (D.C.Cir.1988) (Congress may be "indifferent to the choices an agency makes, within a sphere of action delegated to it, and ... reserve oversight exclusively to itself by precluding judicial review"). Granted, requiring the Corps to "include" an environmental protection "mission" does not seem to demand much of the Corps. Arguably then, it may be contrary to Congressional intent for the judiciary to examine whether anything the Corps does, beyond the mere consideration of environmental protection as part of its overall mission, violates this statute. *See Lincoln*, 508 U.S. at 194, 113 S.Ct. 2024 ("The reallocation of agency resources to assist handicapped Indian children nationwide clearly falls within the Service's statutory mandate" generally, but the specific "decision to terminate the Program [at issue] was committed to the Service's discretion" and unreviewable.). We note, however, that Congress did not simply call for the consideration of environmental protection; it directed that the environmental protection mission be "primary," and directed its inclusion specifical-

ly in the context of the Corps' "planning, designing, constructing, operating, and maintaining" of its "water resources projects." § 2316. This suggests that actual application of that mission in those specific contexts may well have been contemplated.

Overall, we do not see clear and convincing evidence that the Foundation's interpretation of § 306—that the Corps shall seek to implement environmental protection when operating its water resources projects—is contrary to legislative intent. Therefore, for purposes of determining whether judicial review is available for the allegation that the Corps' operational policy violates § 306, the statute (if ultimately given that interpretation) would give us at least some law to apply. "No one doubts that [the Corps] must have 'very broad discretion' in the administration of the [project]. But even very broad discretion is not the same as unreviewable discretion." *Nat'l Treasury Employees Union*, 854 F.2d at 495. Nonetheless, having determined that these allegations are amenable to judicial review based on the colorable interpretation of § 306 that the Foundation posits, the merits of whether the statute actually requires or prohibits the specific actions the Foundation alleges or whether the agency is abusing any discretion Congress has granted it is an entirely separate matter.

## III.

While the District Court erred in holding that the exception to reviewability contained in § 701 applies to the Foundation's claims, the District Court acknowledged that "to the extent that plaintiffs claim that the Corps as a whole has failed to

treatment works ..."); § 307(d) (establishing a wetland enhancement goal and giving "Factors to consider"); § 313(a), (c), 33 U.S.C. § 2320(a), (c) ("the Secretary shall consider the impact of the project on existing and

future recreational and commercial uses ..." and, in doing so, "take such actions as may be necessary to restore such recreational use ...").

take any action to implement § 2316, there is evidence of at least a minimal response by the Corps." *Raymond Proffitt Found.*, 175 F.Supp.2d at 767. It believed that this would be "enough to satisfy the minimum action required of the agency under the APA." *Id.* at 768. We agree.

The WRDA demands the inclusion of "environmental protection as *one* of the primary missions of the Corps of Engineers['] ... water resources projects." 33 U.S.C. § 2316 (emphasis added). Stated another way, when the Corps of Engineers is developing and operating its various water resources projects, one of the primary tasks the Corps is to include is environmental protection. Congress has, however, left the meaning of the phrase "environmental protection" undefined for purposes of § 306. This leaves the Corps with discretion to determine what "environmental protection" is appropriate in a given context. That conclusion is reinforced by the fact that § 306 does not itself purport to place any specific, new requirements on the Corps, but expressly recognizes that "[n]othing in this section affects—(1) existing Corps of Engineers' authorities, including its authorities with respect to navigation and flood control ..." § 2316(b).

Under the WRDA, "the discretion Congress gave to" the Corps "is not unfettered." *Nat'l Treasury Employees Union*, 854 F.2d at 495. In this situation, however, where

> Congress is not indifferent to the choices an agency makes, within a sphere of action delegated to it, and does not reserve oversight exclusively to itself by precluding judicial review, then we presume the legislature expected the court to review those choices *with a degree of scrutiny calibrated to the issues involved.*

*Id.* (emphasis added). Similar to the Snyder Act at issue in the Supreme Court's decision in *Lincoln*, the WRDA speaks only of "water resources projects," plural, in general terms, and does not specifically reference or otherwise elevate any particular projects or class of projects for more detailed consideration. *Cf. Lincoln*, 508 U.S. at 193–94, 113 S.Ct. 2024 (the "appropriations Acts for the relevant period do not so much as mention the Program, and both the Snyder and the Improvement Act likewise speak about Indian health only in general terms"). *Lincoln* is not, of course, specifically controlling. Nonetheless, *a fortiori*, a limited and very deferential review of the Corps' actions in the absence of some Congressional intent to the contrary is appropriate here. "Courts are ... competent to determine whether an agency has exercised its discretion—broad though it be—in a manner arbitrary and capricious." *Nat'l Treasury Employees Union*, 854 F.2d at 496. Nonetheless, "we recognize that our scope of review of the [agency's] function under [the statute] is severely limited because the statute ... vest[s] rather broad discretion in the [agency]." *See Chong v. Director, U.S. Information Agency*, 821 F.2d 171, 176 (3d Cir.1987).

 Applying these principles to the record before us and the specific actions that the Foundation argues are in violation of the WRDA, the Corps did not unlawfully withhold agency action or otherwise act not in accordance with law. First, the Corps has taken steps to include environmental protection as one of the missions of both the Corps, overall, and the Walter Dam specifically. In 1996, the Corps published its current environmental restoration and protection policies in its digest of water resources policies and authorities. These policies were "significantly revised to reflect the increased emphasis being placed upon ecosystem restoration and protection within the Corps of Engineers

(Corps) Civil Works Program. In particular," the policy was a response to "the programs and policies established by recent Water Resources Development Acts." App. 48.

The Corps' digest specifically states its twenty-seven page "guidance on ecosystem restoration is believed to account for the requirements of" the WRDA of 1990. *Id.* at 53. As part of that policy, the Corps acknowledges that, under the Endangered Species Act of 1973, if an "operational activity will negatively impact an endangered or threatened species or its critical habitat," the Corps "will initiate the preparation of a biological opinion by the USFWS [United States Fish & Wildlife Service] and/or the NMS [National Maritime Service]." *Id.* at 60. The Corps acknowledges its "responsibilities under the CWA [Clean Water Act]." *Id.* The policy even states the circumstances under which the Corps will "provide mitigation for adverse impacts on the environment, including fish and wildlife resources." *Id.*

At the Walter Dam in particular, the 1994 F.E. Walter Reservoir Water Control Manual describes how the Corps will "include environmental protection . . . in . . . operating, and maintaining [the] water resources project[ ]" specifically at issue here. *See* 33 U.S.C. § 2316(a). While the "primary objective of the F.E. Walter Reservoir Project is flood control[, o]ther objectives are lake and downstream recreation (whitewater) and drought emergency water supply/*water quality* storage." Supp.App. 64 (emphasis added). Furthermore, the Corps long ago conducted an

environmental assessment for the operation and maintenance of the Dam. Nonetheless, at this particular project, the Corps believes "[w]ater control management needs must take precedence over fishery accommodation but the attempt should be made to adjust procedures for fishery purposes whenever possible." *Id.* at 80.

The record reflects that the Corps has included environmental protection in both its overall operation of its water resources projects and, in particular, at the Walter Dam. The Corps has decided, however, to continue to emphasize flood control as the primary objective of this particular facility, something the WRDA certainly permits it to do. *See* 33 U.S.C. § 2316(b). While we have no reason to consider whether the Corps actions are "a comprehensive response to the enactment of § 2316," we agree with the District Court that they are "enough to satisfy the minimum action required of the agency under the APA." *Raymond Proffitt Found.*, 175 F.Supp.2d at 768.

We also conclude that the Corps has not violated § 306 of the WRDA by refusing to operate the Walter Dam in the specific manner proposed by the Foundation.[8] Although there is no longer any claim by the Foundation that the Corps is failing to comply with any federal environmental protection statute,[9] the Foundation asserts that the Corps "causes harm to the environment" by failing to further alter the river's natural flows. However, absent more particularized language from Con-

---

8. We previously considered § 306's interpretation only to the extent necessary to determine if judicial review of the Corps' actions was appropriate. However, because the parties did not brief the actual merits of their proffered interpretations, we will assume without deciding for purposes of this analysis that § 306 does require the Corps to imple-

ment its environmental protection mission once "include[d]." 33 U.S.C. § 2316.

9. As noted, *supra*, the District Court granted summary judgment to the Corps on the Foundation's claims that the Corps was violating the CWA and NEPA. The Foundation did not appeal from those judgments.

gress or the agency itself that § 306 demands more, "our scope of review ... is severely limited because the statute ... vest[s] rather broad discretion in the [agency]." *See Chong*, 821 F.2d at 176. Without dwelling on the question of whether the Foundation's proposed scheme to further alter the Lehigh River's natural flows would, itself, constitute harm to the environment, as some would no doubt argue, suffice it to say insofar as § 306 of the WRDA is concerned, Congress has granted vast discretion to the Corps in making this determination. The record does not contain sufficient evidence to show that the Corps' decision to generally reproduce in the Lehigh River the flows that nature herself would produce, as opposed to "improving" on nature, was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or resulted in "agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706.

### IV.

We will affirm, but for reasons differing from those offered by the District Court. The WRDA directs that "environmental protection" be included as one of the "primary missions" of the Corps at its "water resources projects." There is nothing discretionary about this command. The District Court erred in concluding there was no "law to apply" in the WRDA and that the exception to reviewability in 5 U.S.C. § 701(a)(2) precludes judicial review of the actions the Foundation alleges are unlawful.

Nonetheless, by failing to give the Corps any particular instructions on how this environmental protection mission is to be included in the Corps' activities, Congress has vested broad discretion in the Corps to determine where, when, and how much of the WRDA's environmental protection mission should be implemented at a given water resources project. The Corps has demonstrated that it is making environmental protection one of its primary missions. Furthermore, the Corps has specifically taken actions to facilitate the protection of the environment at the Walter Dam. Therefore, considering the broad discretion § 306 of the WRDA grants the Corps and the correspondingly deferential review that discretion requires of the judiciary, we will affirm the judgment of the District Court.